**Judith A. NEAL, Plaintiff,**

v.

**HONEYWELL, INC., and Alliant Techsystems, Inc., Defendants.**

**No. 93 C 1143.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 3, 1996.

William J. Holloway, Michael John Leech, William G. Swindal, Thomas Stanley Malciauskas, Robert Hill Smeltzer, Eric W. Apple, Hinshaw & Culbertson, Chicago, IL, for Judith A. Neal.

James A. Burstein, Timothy F. Haley, Thomas Hill Peckham, Kristin E. Michaels, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Honeywell, Inc.

James A. Burstein, Timothy F. Haley, Thomas Hill Peckham, Kristin E. Michaels,

Noah A. Finkel, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Alliant Techsystems, Inc.

Michael D. Monico, Monico, Pavich & Spevack, Chicago, IL, for Janis Frederick.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

In their second motion for summary judgment in this False Claims Act case, defendants Honeywell, Inc. ("Honeywell"), and Alliant Techsystems, Inc., contend that the evidence supporting plaintiff Judith A. Neal's claim under section 3730(h) of the False Claims Act is insufficient as a matter of law. Because we find that genuine issues of material fact exist, we deny the motion.

### Facts

Under contracts with the Department of Defense (the "government") which began in 1981, Honeywell manufactured ammunition for Army aircraft and fighting vehicles at its Joliet Arsenal Plant ("Joliet"). The ammunition was assembled in lots, each of which was given an identification number. The contracts obligated Honeywell to test the ammunition prior to delivery to ensure that it conformed to the government's specifications.

Neal was hired at Joliet in the human resources department as an "organizational development specialist" on March 11, 1985. In February 1987, her superior, William Tyler ("Tyler"), the human resources manager at Joliet, asked her to investigate low morale in the PVC department, where the ammunition was tested to determine if it conformed to specifications. Neal met with James Law, the PVC advisor, and, with his permission, interviewed several PVC employees. During these interviews, she learned that results of ballistics tests on the ammunition were being falsified. After having conversations with several members of the testing team, Neal informed Tyler and Timothy Asmus ("Asmus"), quality manager, about the test data falsification. According to Neal, Tyler told her she was not supposed to have found out about it, that management was aware of it, and that management would handle it. At a meeting of Neal, Asmus and Tyler, both Neal and Asmus took the position that Honeywell's management in Minneapolis had to be informed. Tyler disagreed, stating that the situation would be handled internally at Joliet. There is no evidence that he ever passed on the information Neal disclosed to him either to Honeywell management in Minneapolis or to the federal government.

Dissatisfied with Tyler's response, on Tuesday, March 3, 1987, Neal reported to Honeywell via an employee "hotline," that she had evidence that test data was being falsified. She spoke with Robert Becker ("Becker"), the legal department manager. She requested, among other things, information regarding anonymity.[1] She also asked to be called back at home that evening because she did not want to discuss the test data falsification from her office. Becker agreed and contacted her at home that evening. He assured her that her identity would remain confidential.

Despite his promise to Neal, the following day Becker disclosed not only the substance of Neal's report, but her identity as well, to Mockenhaupt. Neal's identity was also disclosed it to Kenneth Fraasch ("Fraasch"), vice president of ammunition operations.[2] Fraasch's deposition testimony strongly suggests that he very soon disclosed Neal's identity at least indirectly to James K. Frakes, Jr. ("Frakes"), the location manager at Jol-

---

1. Honeywell's employees had been informed, in writing and orally at periodic meetings, both that the hotline existed and how to use it. Among other things, Honeywell informed its employees that a hotline call could be made anonymously. According to Robert R. Mockenhaupt ("Mockenhaupt"), vice president and general manager of Honeywell's defense systems division, this could be done in either of two ways: the employee could make the hotline report without giving his or her name; or two, where the employee disclosed his or her name during the call but requested that his or her identity remain confidential, Mockenhaupt, Becker, and a Mr. Zinnel, the three people designated to answer the hotline calls, had the responsibility to maintain the anonymity of the employee.

2. It is not clear from the record who told Fraasch of Neal's identity. However, it is undisputed that he knew.

iet.[3] In fact, both Timman and Neal testified at their depositions that Timman informed her on March 6 that Frakes knew she was the one who had made the call. There is no evidence that any Honeywell employee was ever disciplined for failing to maintain the confidentiality of Neal's identity.

On March 5, 1987, Neal informed Tyler that she had made the hotline call. According to Neal, Tyler responded angrily and told her she should not have done it, that she had put the plant and the jobs of all its employees in jeopardy. During the next two weeks, Tyler made similar comments. Neal asserts that in early April, Tyler told her she had ruined the facility. Honeywell disputes that Tyler made these comments.[4]

Through the investigation by Timman and Ray Loonan,[5] Honeywell determined by Friday, March 6, 1987, that there was substance to Neal's allegations, and it relayed information about the testing irregularities to the federal government. That day, Frakes and other top managers were informed that they were to be suspended on Monday, March 9, 1987.[6] And, on Monday, March 9, 1987, Honeywell suspended all ammunition testing at Joliet, replaced the managers there with Honeywell personnel from outside Joliet, and began a formal internal investigation. Frakes and the other suspended managers were restricted, for the most part, to a training room located near Neal's office.

Mockenhaupt announced the suspensions and investigation to the employees at Joliet via a memorandum which stated that the investigation resulted from a hotline call. There is evidence (in the form of deposition testimony from persons employed at Joliet at the time) that an active "rumor mill" regarding the identity of the whistleblower quickly developed. According to some of the deponents, it was soon known by many employees at the Joliet plant that Neal had made the hotline call.

On March 17, 1996, Neal learned from Christopher Long ("Long"), a human resources trainer and a friend of hers, that David Young ("Young"), a production manager at Joliet and one of the suspended managers, had threatened to "get" the whistleblower.[7] She informed Timman, who asked if she wanted physical protection, which she declined. There is no evidence that Timman informed any of his superiors of Young's threats.

When Honeywell began its internal investigation, it assigned A. Allen Gray ("Gray"), associate general counsel at Honeywell, and Daryl Zimmer ("Zimmer"), Honeywell's director of ethics, to investigate either "personnel actions," according to Honeywell, or Honeywell's possible criminal and civil expo-

---

**3.** Bruce Timman ("Timman"), an auditor who conducted the initial investigation into Neal's allegations, instructed Fraasch not to disclose Neal's identity to anyone else.

**4.** In a memorandum to Gray dated January 19, 1989, regarding an interview by Michael Thompson, a special agent with the Department of Defense Inspector General's office, Tyler referred to Neal's hotline call as "infamous." (Pl.'s Ex. 26, Tyler Dep. Ex. 10 at 1.) Tyler asserted as his deposition that he did not mean the term to be negative.

**5.** Ray Loonan ("Loonan") was a quality engineer. In accordance with Becker's instructions during the hotline call, Neal arranged interviews of the PVC personnel who knew of the test data falsification with Honeywell personnel from Minneapolis at a local Holiday Inn. Loonan and Timman conducted in the interviews.

**6.** There is evidence that Frakes utilized the intervening weekend of March 7 and 8 to shred and remove documents. Frakes' secretary, Sandra Hamon ("Hamon") informed Rodney Spotts ("Spotts"), who was acting plant manager at Joliet from March 9 until June 1987, that Frakes was shredding documents on the morning of Monday, March 9, 1987. Spotts instructed Frakes to stop immediately. Mockenhaupt testified that no one reported to him that documents were being shredded at Joliet.

**7.** The parties dispute the substance of Young's threats. Neal asserts that Long told her that Young made two specific comments. However, Long testified at his deposition that he did not recall telling Neal about any threats. As a result, Neal's recollection of what Long told her is inadmissible hearsay, which we may not consider on a motion for summary judgment. See Fed.R.Civ. Pr. 56(e). See also Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996); Russell v. Acme–Evans Co., 51 F.3d 64, 68 (7th Cir.1995); Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 570 n. 4 (7th Cir.1989). However, Honeywell does not dispute that Young threatened to "get" the whistleblower.

sure, according to Neal.[8] During their interviews with Joliet employees, they learned on April 9, 1987, that Young had threatened the whistleblower. At some point thereafter, one or both of them confronted Young, who admitted making the threat and promised it would not be repeated. However, in their report, given to Honeywell's management later, Gray and Zimmer concluded that there was some evidence that Young had "not fully overcome these feelings of retribution and reprisal." (Pl.'s Response to Defs.' Rule 12(M) Statement, Ex. 10.) There is no evidence that either Gray or Zimmer made any report to their superiors when they first learned of Young's threats. No disciplinary action was initiated against Young at that time, and Spotts, the acting plant manager at Joliet, never addressed the issue with him.[9] There is evidence that none of the upper level personnel at Honeywell involved in the Joliet investigation, including Mockenhaupt, Becker, Spotts, and Gray, ever made an effort to protect Neal from retaliation or harassment at the plant. In fact, each of these people testified at their depositions that either that they took no action in this regard or that it was not their responsibility to do so.

In the second week of May, someone at Honeywell informed Neal that the investigation was about to conclude and that personnel actions would be taken. Tyler offered Neal a one-month paid leave of absence, which she accepted because she was concerned that if any of the suspended personnel were disciplined, they might retaliate against her. Neal did not return to work until the middle of June.

On May 11, 1987, in conjunction with the completion of the internal investigation, Young was transferred immediately to a position at a Honeywell facility in Minnesota. Although he received a memorandum from Fraasch which informed him that his grade was being lowered and which stated that his "expressions of retribution and possible attempts to intimidate employees ... [were] unacceptable management behavior," (Def.'s Ex. P–1), in fact Young was placed in charge of a factory employing about 375 people (nearly double the size of Joliet, where he had been the number two man) and continued to receive the same salary.[10] He was informed in August 1987 (after the transfer) that, beginning in November 1987, he would receive a merit salary increase of about $800 per month.[11]

Neal contends that after she informed Tyler that she was the whistleblower, he stripped her of virtually all her responsibilities. She also asserts that he isolated her from other employees at the plant. The defendants dispute this and argue that she continued to perform rewarding job duties. They also assert that some of Neal's official responsibilities, such as "team building," were temporarily suspended because of the level of disruption which existed at Joliet as a

8. A memorandum from Mockenhaupt to Gray dated March 13, 1987, requests Gray to initiate a "legal inquiry into the facts and circumstances of these allegations for the purpose of providing legal guidance to corporate management." (Pl.'s Response to Defs.' Rule 12(M) Statement, Ex. 8.) This supports Neal's characterization of Gray's investigation.

9. There is evidence that Tyler knew of Young's threats, although we do not know how. He testified at his deposition that he took no disciplinary action against Young because Young and the other managers were already upset at being isolated and he did not want to "add fuel to the fire." He also testified that although it was part of Honeywell's personnel policy to discipline any employee who threatened another employee with physical harm, he did not follow that policy here because he thought the suspended managers had already been punished enough and he did not want to upset them further.

10. The defendants stated in their opening brief that Honeywell transferred Young and lowered his salary level. (Defs.' Br. at 4.) Neal responded with evidence that Young's salary level did not change at the time of the transfer. In their reply, defendants stated only that Young was transferred. (Defs.' Reply at 6.) Considering that the evidence that Young's salary was not lowered was contained in Honeywell documents and Young's deposition, the defendants either knew or should have known, when they filed their opening brief, that Young's salary level had not been lowered. The inclusion of this false statement was improper.

11. Various other personnel actions were taken against other Joliet employees, but they are not relevant to this motion.

result of the investigation. We find that there are significant disputes of material fact regarding this issue.

By April 1987, Neal expressed to friends and her counselor that she felt she was being treated badly because she had made the hotline call and that she wanted to leave Honeywell. She contends that the stress of her situation there caused severe depression, insomnia and nightmares. She put her house on the market on April 23, 1987. In March and April 1987, she interviewed for and was offered positions at Honeywell facilities in Minneapolis and Tampa.[12] She declined them because she felt that such moves would be only lateral and did not include salary increases.[13] When the house sold in the middle of August 1987, she immediately resigned from Honeywell and moved to Connecticut, where she did not have a job. After several months of being unable to work at all due to her depression, she took a job as a cashier and tried selling cosmetics.[14] She eventually resumed her career by teaching.

### Discussion

Rule 56(c) of the Federal Rules of Civil Procedure allows us to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In considering the evidence submitted by the parties, we do not weigh it or determine the truth of asserted matters. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). We are to view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Transamerica Ins. Co. v. South*, 975 F.2d 321, 327 (7th Cir.1992). "If no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d

928, 931 (7th Cir.1995) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).

Before we address the merits of the defendants' motion, the parties have raised a legal question: what standard is applied to claims of retaliation under the False Claims Act? The defendants assert that we should use the standard for constructive discharge claims under Title VII, namely, that Honeywell "created working conditions so intolerable that [they] would cause a reasonable employee in Neal's position to immediately depart." (Defs.' Br. at 6.) They also argue that under this standard, the employee may be not unreasonably sensitive to her working environment and " 'must seek legal redress while remaining on his or her job unless confronted with an "aggravated situation" beyond "ordinary" discrimination.' " *Id.* (quoting *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 677 (7th Cir.1993)). Furthermore, they assert, Neal cannot recover any claim of harassment or emotional distress because she cannot show a materially adverse change in her working conditions. Neal, on the other hand, argues that under the False Claims Act, we should employ the standard that if an employee's claims are sufficient to satisfy Rule 11, an objective test, then the employee should be free from any form of discriminatory or retaliatory treatment, as long as the employee actually suffers an adverse effect from that treatment. Neither party cites to us any cases decided under the False Claims Act.

Neal's retaliation claim is brought under section 3730(h) of the False Claims Act, which states:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any way discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an

12. Neal also interviewed at a Honeywell facility in Phoenix.

13. The defendants have submitted evidence that it was Honeywell's policy regarding intracorporate transfers not to offer the transferring employee a salary increase immediately in order to prevent bidding wars between Honeywell facilities.

14. Neal has a Ph.D. from Yale.

action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees....

31 U.S.C. § 3730(h). In the only decision from the circuit courts of appeals to address the elements of a claim under this provision, the Ninth Circuit has held that a plaintiff must prove three things: first, the plaintiff was engaged in conduct protected under the False Claims Act; second, the employer must have known that the plaintiff was engaging in such conduct; and third, the employer must have discriminated against the plaintiff because of her protected conduct. *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1269 (9th Cir.1996).

In paragraph 34 of her complaint, Neal alleged:

Plaintiff suffered discrimination in the terms and conditions of her employment, including constructive discharge, demotion, change of work duties and responsibilities, constructive suspension, threats and harassment, misrepresentation of how she could report said misconduct and maintain her anonymity, all committed by her employer for the reason that the employee committed lawful acts; namely, reporting false claims and fraud against the United States internally to Honeywell on the "Infoline", in furtherance of an action under 31 U.S.C. § 3730 ...

In addition, Neal has submitted the following evidence in opposition to this motion:

1) Tyler, Neal's boss, made a number of direct negative comments to Neal regarding the hotline call, including statements that she should not have made it, that she had jeopardized the plant and the jobs of all of its employees, and that she had ruined the plant;

2) Tyler made significant changes to Neal's work assignments such that most of her job duties were taken away;

3) Tyler isolated Neal from other employees at the plant;

4) after Becker promised her anonymity, Becker and Fraasch, as well as others, disclosed her identity, and it eventually became common knowledge at Joliet that Neal was the whistleblower;

5) Young threatened to "get" the whistleblower;

6) Honeywell failed to discipline Young effectively for making the threat, despite the conclusion by Gray and Zimmer that Young had not gotten over his feelings of reprisal;

7) the suspended managers, including Young, were restricted to a training room located in the same trailer as Neal's office;

8) although Timman offered Neal physical protection when she reported Young's threats, he did not report it to his superiors, and Gray and Zimmer did not learn of it until three weeks later; and

9) Neal decided to leave Honeywell in April 1987 and resigned when she sold her home in August 1987, even though she had not secured other employment.

Hence, it is clear from Neal's allegations and evidence that her claim under section 3730(h) involves much more than just constructive discharge.

The defendants' argument that we should apply the standard used in Title VII constructive discharge claims is not dispositive of Neal's section 3730(h) claim in its entirety because she has asserted other acts of retaliation besides constructive discharge.[15] Moreover, we need not resolve the question of what standard applies specifically to her evidence of constructive discharge, for we conclude, as a matter of law, that it fails under any standard. The undisputed evidence shows that two Honeywell facilities offered Neal positions at the same salary she was earning in Joliet and involving job re-

15. The defendants' counsel represented to this Court, in seeking permission to file a second motion for summary judgment, that, if decided in their favor, it would be dispositive of Neal's claim. That representation was in error, which counsel should have known.

sponsibilities appropriate to her education and experience, but she declined them. Although Honeywell's personnel in Joliet may have participated in or permitted harassment and intimidation of Neal, it is *Honeywell* as a corporate entity, not the Joliet plant, which would be liable on the constructive discharge claim.[16] Neal's only dissatisfaction with the offers from the other facilities was that they were not promotions. However, an employer need not promote an employee, even a whistleblower, in order to avoid a constructive discharge claim. Neal has made no contention either that the offers were so miserably inadequate that no reasonable employee would have accepted them or that she would have received a promotion at this time but for her hotline call. Hence, because Neal had other reasonable employment opportunities with Honeywell which she chose to decline, she cannot proceed on the theory that Honeywell retaliated against her by constructively discharging her.[17]

Of the nine facts we listed above which support Neal's retaliation claim, *see supra* at 394, she loses only the last due to the failure of her constructive discharge claim. Thus, we must consider next whether her evidence of breach of the promise of confidentiality of Neal's identity,[18] the harassment by Tyler, the curtailment of her job responsibilities, and the threat by Young are sufficient to defeat summary judgment.

■ Before we consider the merits of Neal's claim under section 3730(h), we must address the inadequacy of the defendants' Local Rule 12(N) response to Neal's statement of additional facts. Local Rule 12(N) requires, in pertinent part, that a party opposing a motion for summary judgment file,

> a concise response to the movant's statement ... contain[ing] (a) a response to each numbered paragraph in the moving

party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record and other supporting materials relied upon.

Local General Rule 12(N)(3) of the Northern District of Illinois (1994). Similarly, Rule 12(M) requires that where the opposing party has submitted additional facts, the moving party may submit a reply in the form set forth in section 12(N)(3)(b). It also states, "All material facts set forth in the statement filed pursuant to section N(3)(b) *will be deemed admitted unless controverted by the statement of the opposing party.*" Local General Rule 12(M) of the Northern District of Illinois (1994) (emphasis added). We are entitled to require strict compliance with the requirements of Rule 12. *See, e.g., LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 388–89 (7th Cir.1995) ("[The Seventh Circuit has] on numerous occasions upheld a district court's strict adherence to [Rule 12].").

■ In responding to many of the facts in Neal's Rule 12(N) statement of additional facts, the defendants neither admitted nor denied the fact, but merely stated, "Plaintiff does not set forth facts requiring denial of summary judgment." *See, e.g.,* Defs.' Rule 12(M) Reply, ¶¶ 123–25, 127–29, 131–36, 139–40.[19] The defendants grossly misunderstand their role in this process. They are supposed to either admit, or provide us with facts and record citations which controvert, each of Neal's facts. That is what Rule 12(M) plainly requires of them. The determination of whether a fact does or does not require denial of summary judgment is one for the

---

16. Neal has offered no evidence that Joliet or any other Honeywell facility should be treated as an entity independent of Honeywell as a corporation.

17. Because this issue was not raised by the defendants and hence was not briefed by the parties, Neal may file a motion to reconsider if she determines that she has appropriate legal grounds for doing so.

18. We see no reason why disclosure of a whistleblower's identity, where the employer has expressly promised anonymity and knows or should know that the whistleblower's disclosures will likely create bad feelings among his or her co-workers, cannot constitute a form of harassment.

19. This citation is not intended to be exhaustive.

Court, not for the moving party. Here, it is impossible for us to interpret this response as controverting Neal's statements. As a consequence, the defendants have left us with no choice under Rule 12(M) but to deem each of the facts to which they provided this response as admitted by them.

■ The defendants also responded to a number of Neal's Rule 12(N) additional facts by stating, "Paragraph [ ] should be stricken for the reasons stated in the Defendants' Motion to Strike Portions of Plaintiff's Rule 12(N) Statement re: Constructive Discharge." (*See, e.g.,* Defs.' Rule 12(M) Reply, ¶¶ 35–38, 40–122.) [20] In their motion to strike, the defendants assert that Neal's 12(N) statement of additional facts includes many facts irrelevant to the issues they raised. Neal responds that she needed to set forth all of the facts included in her 12(N) statement to set forth properly the reasons why summary judgment should be denied.

To a very great extent, we have not considered the facts which the defendants seek to strike. Thus, the motion is largely moot. To the extent we have considered the facts which defendants find irrelevant, it is because we have found them relevant, although not dispositive of this motion.[21] Obviously, to this extent, the motion should be denied.

But, where does that leave the defendants? They have not controverted the facts in question, as Local Rule 12(M) requires. Under other circumstances, that would require us to deem them admitted. Here, however, that result is not fair to the defendants.[22] Because the vast majority of the facts in question are not important to this motion, we also

do not ask the defendants to respond to them now. Rather, we simply deny the defendants' motion to strike portions of Neal's 12(N) statement of additional facts. To the very limited extent we have considered the facts in question, we deem them denied by the defendants. We may still consider them, for the standard for summary judgment requires that where Neal and the defendants dispute a fact on summary judgment, we must view all facts in the light most favorable to Neal.

■ As we noted above, there are three elements to a claim under section 3730(h): 1) the plaintiff was engaged in conduct protected under the False Claims Act; 2) the employer must have known that the plaintiff was engaging in such conduct; and 3) the employer must have discriminated against the plaintiff because of her protected conduct. *See supra* at 394. There is no dispute that Neal was engaged in conduct protected under the False Claims Act. Neal's standing to sue under the Act has been decided by the Seventh Circuit. *Neal v. Honeywell,* 33 F.3d 860, 863–64 (7th Cir.1994). In addition, the defendant does not dispute that the investigation of test data falsification at Joliet occurred because of Neal's hotline call. (Defs.' Rule 12(M) Reply, ¶¶ 227–38.) There is clearly no dispute that Neal can satisfy the second element, for the defendants were informed of Neal's investigation into test data falsification by her hotline call, and the evidence of the Honeywell personnel who were aware of the hotline call and the investigation is overwhelming. In addition, there is evidence that knowledge of Neal's identity as

---

**20.** Once again, this citation is not intended to be exhaustive.

**21.** We have considered paragraphs 103, 107, 108, and 110–15. Tyler's refusal to report Neal's concerns not only sheds light on his attitude when he made comments to her after the hotline call, it also refutes the defendants' contention that Tyler encouraged Neal to use the hotline. We have also considered paragraphs 128, 129, and 131, regarding the promise of anonymity to hotline callers.

**22.** Local Rule 12 does not contemplate a motion to strike. The defendants' strategy, of filing only the motion to strike without responding to the facts in question, is a risky one. If the motion is unsuccessful, there is no rule that requires the court to give the movant additional time to file proper responses under Rule 12(M), particularly not where, as here, the motion to strike is filed only one week before the ruling date. Thus, a court could decide that the movant had failed to respond properly in a timely manner and deem the facts in question admitted. The better

the whistleblower was widespread.[23] Finally, while the defendants dispute Neal's evidence, she has put forth sufficient evidence that she was discriminated against as a direct result of making the hotline call to defeat summary judgment.

■ The defendants also contend that they cannot be held vicariously liable for Young's threat. Again analogizing to Title VII, they assert that an employer can be held liable under section 3730(h) for a co-worker's threat or harassment only if, knowing or having reason to know of the misconduct, it either unreasonably delays taking remedial action or if the action it does take is not reasonably likely to prevent the misconduct from occurring. (Defs.' Br. at 3.) They then engage in a discussion of the remedial actions taken after Honeywell learned of Young's threat against the whistleblower. The obstacle to the defendants' argument is that the determination of whether the employer took reasonable and timely remedial measures is for the trier of fact. The only way the defendants can prevail on this argument is if Neal's evidence is so inadequate as to bar this part of her claim as a matter of law.

We have the following evidence regarding Honeywell's remedial action. When Neal reported Young's threat to Timman, he offered Neal protection. While that was an appropriate offer, there is no evidence that he reported the threat to his superiors. No one raised the matter with Young at that time, even though Honeywell had a personnel policy which permitted discipline of an employee who threatened another employee with physical harm. Tyler, Neal's boss and the person who made direct negative comments to her about the hotline call, declined to act because he was concerned that Young, whom he thought had been punished enough already, might get more upset. Gray and Zimmer

learned of the threat through employee interviews three weeks later. When they spoke to Young about it, they concluded his hostility had not subsided. Yet, they did nothing.[24] It was not until May 11, 1987, nearly two months after Neal first reported the threat, that Young was disciplined. His discipline (which was also imposed for his negligence, as the number two manager at Joliet, in permitting the test data falsification to occur) consisted of a transfer to a position in which he supervised nearly twice the number of employees at the Joliet plant at the very same salary. However, Honeywell did provide Neal with a one-month paid leave of absence at the time the results of the investigation were announced. Neal has raised sufficient question of fact regarding whether Honeywell's remedial actions were adequate and appropriate to preclude summary judgment on this issue. It will be up to the trier of fact to decide if Honeywell is to be held liable for Young's threat.

■ Neal has moved to strike a paragraph of the affidavit of Spotts, submitted by the defendants in support of the motion for summary judgment, as containing facts not disclosed by the defendants during discovery which are inconsistent with certain of the defendants' discovery responses and deposition testimony. The paragraph addressed Spotts' belief that "team-building activities" were inappropriate under the circumstances that existed at Joliet. Neal points out that the paragraph suggests, but does not state, that Spotts instructed Tyler to curtail Neal's activities in this regard. While this is one interpretation of the paragraph, we deny the motion to strike on the grounds that we have not made that inference. We are aware of no evidence that Spotts gave Tyler such an instruction and have decided the defendants' motion on that basis.[25]

course, it would seem, would be to file both a motion to strike and a response.

23. In any event, Honeywell makes no argument that its management did not know of Neal's conduct.

24. From the evidence before us, Gray and Zimmer did not inform Honeywell's management of Young's threat until they submitted their written report. Although we know they learned of the

threat on April 9, 1987, we do not know either when they spoke to Young or when they submitted their written report.

25. The defendants did submit the affidavit of Tyler, which states that Honeywell's director of human resources, Tom Radziej, suggested to Tyler that the human resources department "keep a low profile" so as not to interfere with the investigation. Of course, Tyler's recitation of Radziej's statement to him is hearsay, and the

### Conclusion

For the forgoing reasons, the defendants' motion for summary judgment on the issue of constructive discharge is denied. In addition, the defendants' motion to strike portions of plaintiff's Rule 12(N) statement of additional facts is denied. Plaintiff Judith A. Neal's motion to strike the affidavit of Rodney Spotts is also denied.

defendants have not demonstrated that it is admissible.