Judith A. NEAL, Plaintiff–Appellee,

v.

HONEYWELL INC. and Alliant Techsystems Inc., Defendants–Appellants.

Nos. 98–1728, 98–3162.

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1999.

Decided Sept. 15, 1999.

William J. Holloway, Michael J. Leech (argued), Hinshaw & Culbertson, Chicago, IL, for Plaintiff–Appellee.

Michael A. Warner (argued), Thomas H. Peckham, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants–Appellants.

Before EASTERBROOK, RIPPLE, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

The False Claims Act, 31 U.S.C. §§ 3729–31, penalizes contractors who submit fraudulent bills to the United States. Private citizens may pursue *qui tam* actions under the Act, taking a portion of the recovery as reward (and incentive) for their efforts. In 1986 Congress added a whistleblower-protection provision, forbidding retaliation against employees who turn in their employers for violating the Act. 31 U.S.C. § 3730(h). About a year after the anti-retaliation provision went into effect, Judith Neal, an employee in Honeywell's personnel department, discovered via a tip and a little leg work that a division in the company's Joliet Arsenal Plant was covering up its production of ammunition that failed to meet specifications. Employees falsified quality-control test results before shipping munitions to the Army. Neal used Honeywell's internal hotline for reporting suspected fraud, and higher-ups within the company immediately contacted the Army and began their own investigation. Honeywell eventually reached a settlement with the United States costing the corporation $2 million in damages plus $400,000 in replacement ammunition. The revelations also caused a managerial shakeup: Honeywell eventually fired two managers and transferred a third (Steve Young) to a position in another state. Neal herself soon left Honeywell and eventually sued under § 3730(h). A prior opinion of this court, 33 F.3d 860 (1994), discusses some procedural issues; now we have an appeal from a jury's decision in Neal's favor.

For her services as whistleblower, Neal received the reward of resentful mistreatment, details of which can be found in the district court's several published opinions. See especially 995 F.Supp. 889 (N.D.Ill. 1998); 942 F.Supp. 388 (N.D.Ill.1996). Although the parties disagree about what actually happened to Neal, we must regard as true the version of events most favorable to the verdict. The most important bits of the story are as follows: during the investigation, Young began a campaign of intimidation against whoever had alerted his superiors. The parties dispute whether Young then knew Neal's identity but agree that he made plenty of threats. Young related to all who would listen his plans to "get" the snitch, describing the whistleblower as "dead meat," and announcing his intention to "break his legs." Honeywell did nothing in response to these public threats, later asserting that it would only "add fuel to the fire" to penalize Young for his intimidating words (or for his deeds: the eventual transfer was not a demotion, see 942 F.Supp. at 392). But while Honeywell permitted Young to fulminate, it suggested that Neal leave town. Just before announcing the first steps it would be taking to discipline those responsible for the fraud, Honeywell chose to give Neal a one-month paid leave of absence "for her own safety". Bill Tyler, Neal's boss, harangued her repeatedly for reporting the fraud, then took away most of her responsibilities until less than a quarter of her duties remained. Neal took the hint and quit. Six years later she sued under the Act, claiming retaliatory discharge and harassment. A jury agreed with her accusations and awarded her $550,000 for emotional distress (she accepted a remittitur to $200,000), and $40,000 in back pay (which, as a result of the statutorily-required doubling plus interest, the judge increased to $150,000). The judge also awarded her $1.6 million in attorneys' fees and costs.

█ If successful on its primary objection to the judgment, Honeywell would be

home free: it argues that Neal's suit is time-barred. We have heard this before; it was the subject of Honeywell's interlocutory appeal under 28 U.S.C. § 1292(b). Back in 1994, Honeywell argued that a five-year rather than a six-year statute of limitations should apply to retaliation claims under § 3730(h). We concluded that the applicable period is six years and wrapped up: "Neal filed this suit under § 3730 within six years of Honeywell's false claims. It is therefore timely." 33 F.3d at 865. Honeywell now contends that Neal's claim fell outside the limitations period, be it five *or* six years. Neal argued in the district court that Honeywell could not have a second crack at a statute of limitations argument. But the judge disagreed, calling the conclusion of our opinion "dicta," because "the issue before [the seventh circuit] was which of two possible statutes of limitations applied here, not whether, as a factual matter, Neal's claim was timely under § 3731(b)(1)." *Neal v. Honeywell, Inc.*, 1996 WL 501564 at *3 n. 1 (N.D.Ill.1996). Neal does not renew this procedural objection in her appellate brief, perhaps because the district judge ruled against Honeywell in the end, but her point is sound. Honeywell's current position contradicts the premise of its interlocutory appeal in 1994 and would make that interlocutory review superfluous. This is something in which the judicial system is vitally interested even if Neal no longer cares. Her failure to stand on a procedural objection therefore is not dispositive. Sometimes the judiciary must act in self-defense.

Had Honeywell waited until after final judgment to take its appeal, it could have presented to us both its factual argument that Neal failed to make the six-year cutoff, and its legal argument that the outer limit is five years. To take an interlocutory appeal, however, Honeywell had to satisfy § 1292(b), which limits review to issues that "involv[e] a *controlling question of law* as to which there is substantial ground for difference of opinion and [whose immediate resolution might] *materially advance the ultimate termination* of the litigation" (emphasis added). By seeking permission to appeal under § 1292(b), therefore, Honeywell was representing that these conditions were satisfied. After receiving permission to take such an appeal and losing, a party cannot contend that the answer is irrelevant. If Honeywell is right now, then it was wrong to appeal in 1994. See *In re Hamilton*, 122 F.3d 13 (7th Cir.1997); *United States v. Rent–A–Homes Systems of Illinois*, 602 F.2d 795, 797 (7th Cir.1979). An appeal may present a "controlling" question of law even though later events may alter the way in which the answer affects the case. *Johnson v. Burken*, 930 F.2d 1202, 1205 (7th Cir.1991). But a § 1292(b) appeal can materially advance the termination of the case only if its disposition is conclusive on the contested issue. To persuade us to hear the interlocutory appeal, Honeywell told us that the case turned on the difference between the five- and six-year periods. We picked six, which resolves the limitations dispute.

Honeywell's next set of contentions focuses on the sufficiency of the evidence Neal presented at trial. According to Honeywell, Neal didn't show enough to prove harassment or constructive discharge. If substantial evidence supports Neal's position, however, then the jury was entitled to find for her. *Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 706–07 (7th Cir.1999). As we've already mentioned, her duties were whittled away after she reported the fraud. Although Honeywell points out that *some* of her tasks remained, this is not the standard. Instead, the jury must ask whether a reasonable employee would have found her working conditions so inappropriate to her skill level that they "made remaining in the job unbearable." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998). A jury could have reached that conclusion without taking leave of its senses. Neal, who holds a Ph. D. in "Organizational Behavior," worked for two years at Honeywell, during

which she coordinated training, helped departments to resolve disputes and systemic morale problems, evaluated employees' productivity, wrote the plant-wide newsletter and ghost-wrote management communications, and conducted surveys. After blowing the whistle, she was left with only the occasional training duty, and (ironically) the responsibility for drafting a new discipline policy. For a highly educated employee, such a drastic diminution of duties might suffice as a "constructive discharge."

■ Neal's theory rests on more than just the reduction in her responsibilities, however. Her immediate supervisor made her feel like a traitor for ratting on fellow employees. Worse, Neal worried that Honeywell would not be able to guarantee her safety at work. Honeywell places much stock in the absence of direct proof that Young knew Neal's identity and argues that, even if he did know, it was Neal's fault for being indiscreet. This is irrelevant. Section 3730(h) is not limited to secret reports. Anyway, it's cold comfort to hear that you'll probably survive so long as the thug doesn't figure out who you are. Cf. *Monfils v. Taylor*, 165 F.3d 511 (7th Cir.1998). Even less comfort is it to be told that you've only yourself to blame. Honeywell tolerated Young's tirades, but it couldn't expect Neal to display such equanimity. Neal presented more than enough evidence to allow a jury to find that she was forced out of her job at Honeywell.

■ Honeywell's contention that Neal could have avoided most of her loss had she taken one of the transfer offers presented to her shortly after she reported the fraud is unavailing. The district judge properly responded that Neal "could hardly be expected to anticipate Honeywell's action later on and begin mitigating damages before" she was constructively discharged. 995 F.Supp. at 891. Honeywell's submission that we should remand for a new trial because the manifest weight of the evidence does not support the jury's verdict is equally feeble. Motions for new trials under Fed.R.Civ.P. 59(a) are addressed to the discretion of the district court, and the judge's order implementing this verdict is not an abuse of discretion. *Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788, 797–98 (7th Cir. 1989); *Spanish Action Committee of Chicago v. Chicago*, 766 F.2d 315, 321 (7th Cir.1985).

■ Now we turn to the financial aspects of the award. Section 3730(h) provides for "reinstatement ..., 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." Because Neal was awarded both double back pay *and* compensation for emotional distress, Honeywell complains that she received duplicative recovery. Double back pay functions as liquidated damages, Honeywell insists, incorporating hard-to-measure injuries such as emotional distress. If the Age Discrimination in Employment Act, 29 U.S.C. § 623, or the Fair Labor Standards Act, 29 U.S.C. § 216(b), supplied the rule of decision, this point might be well taken; some damages provisions in those statutes include emotional distress and other non-economic losses within "liquidated damages". *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942) (FLSA); *Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684, 687–88 (7th Cir.1982) (ADEA). (Some but not all: a post-*Missel* amendment to the FLSA allows employees to recover emotional distress damages in retaliation cases. *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1226 (7th Cir.1995).) We deal, however, with the False Claims Act rather than the ADEA or the FLSA. The False Claims Act provides for *both* double back pay *and* other relief in the form of "special damages." But what exactly are special damages?

■ The phrase is an old one: *"Special*, as contradistinguished from *general* damage, is that which is the natural, but not the necessary, consequence of the act complained of." *Roberts v. Graham*, 73 U.S. (6 Wall.) 578, 579, 18 L.Ed. 791 (1867) (emphasis in original). Whether a particular kind of injury gives rise to "special" damages thus depends on the tort committed. The usual consequences of a wrong are "general" damages, and unusual consequences are "special." *LINC Finance Corp. v. Onwuteaka*, 129 F.3d 917, 922 (7th Cir.1997). Thus, if the tortfeasor cut off his victim's finger, emotional distress would be an ordinary consequence and part of general damages. *Threlkeld v. CIR*, 87 T.C. 1294, 1300, 1986 WL 22061 (1986). Emotional distress is not an ordinary consequence of patent or copyright infringement, however, and would fall into the category of "special damages" for those torts. Cf. *Smith v. DeBartoli*, 769 F.2d 451, 453 n. 2 (7th Cir.1985). The classification of emotional distress can be difficult: are emotional injuries expected, or unexpected, when the wrong in question is retaliation against a whistleblower?

Getting the distinction right might matter for pleading (see Fed.R.Civ.P. 9(g)), or it might determine whether one has a claim at all (for instance, the tort of malicious prosecution requires the plaintiff to show "special damages" beyond the annoyances that wrongful litigation usually creates. *R.J.R. Services, Inc. v. Aetna Casualty & Surety Co.*, 895 F.2d 279, 282 (7th Cir.1989)). But for purposes of § 3730(h) it is unnecessary to classify emotional distress, because the statute allows both general and special damages. It provides for reinstatement and back pay, the usual remedies in wrongful-discharge cases. Perhaps this even implies that back pay is the "general damages" remedy. If loss of income from employment is the usual consequence, then emotional distress must be the unusual one, and hence compensable as special damages. On this understanding, § 3730(h) provides for double general damages, plus undoubled special damages.

Honeywell should rest content that emotional distress is in the "special" category, and thus not doubled!

■ Is $200,000 for emotional injury impermissibly high? Honeywell says yes, citing a slew of discrimination cases that have ended with smaller recoveries for emotional distress. Had Neal merely lost her job as a result of the discrimination, we would think $200,000 excessive, even though Neal suffered ostracism, a year-long depression, and upheaval in her life. But Neal's claim is out of the ordinary, given the threats of physical injury. Neal feared that Young would figure out her role in the affair and "get" her as promised. So palpable was the risk that even Honeywell felt that the best course of action was to send Neal off on a one-month leave of absence, because it could not guarantee her safety. Knowledge that Honeywell deemed itself unable (or unwilling) to protect her would have led to fear and distress well exceeding the norm for verbal harassment and wrongful discharge. Whether or not $200,000 is the right remedy, the only question for us is whether there was a "rational connection between the award and the evidence". *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir.1995). The district judge did not err in concluding that such a connection had been established.

■ Honeywell's final appellate contentions stem from the district judge's award of $1.46 million in attorneys' fees and $147,000 in costs. Both fees and costs are recoverable, but the language of § 3730(h) has led to a dispute about the rules for their calculation. Recall its text: the wronged employee receives "compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." "Costs and reasonable attorneys' fees" are a component of "special damages." Because attorneys' fees are part of "damages," Honeywell says Neal can recover only what she is obligated to pay her

lawyers. To see the point, suppose § 3730(h) said that an employee could recover "any special damages sustained as a result of the discrimination, including medical costs." If a friendly psychiatrist had donated care to help Neal overcome her depression, she would not have been entitled to recover from Honeywell the "reasonable" cost of the psychiatrist's time; she could have recovered only the *actual* cost, which in this example is zero. See, e.g., *Tinnerholm v. Parke, Davis & Co.*, 411 F.2d 48, 54 (2d Cir.1969). Honeywell wants us to treat legal expenses the same way. The difference between the actual-cost approach and a "reasonable cost" approach is considerable. "Reasonable" fees were calculated via the lodestar method: the number of hours of legal services reasonably applied to the client's case, times the market rate for each hour. An actual-cost approach would have led to a much lower award. Neal and her lawyers made a contingent-fee arrangement that obliges Neal to pay 40% of her recovery. If the judge had used an actual-cost rather than a reasonable-cost approach, Honeywell would owe about $1.26 million less. (Honeywell does not contend that the award is too large if the lodestar method governs. We need not decide whether this is right. See *Cole v. Wodziak*, 169 F.3d 486, 488–89 (7th Cir.1999).)

Section 3730(h) is unusual among fee-shifting laws. Only three statutes classify attorneys' fees with damages in exactly this way (the other two are 18 U.S.C. § 1031(h) and § 3059A(e)), and none of the three has been the subject of litigation. Each fee-shifting statute must be interpreted according to its own terms, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), so we cannot take the easy way out by saying that all fee-shifting laws incorporate the lodestar approach unless Congress clearly departs from that model. But we do think that the lodestar cases (and the statutes they interpret) are significant, for, although other fee-shifting statutes do not treat fees as part of damages, they do illuminate the understanding of what it means to "include" fees in another category.

Most of the reasonable-fee statutes say that fees should be awarded as part of costs. See, e.g., 15 U.S.C. § 15; 18 U.S.C. § 1964; 42 U.S.C. §§ 1988, 2000e–5. Awards of costs, no less than damages, are limited to actual outlays or obligations. If Neal's friend were a printer rather than a psychiatrist, and donated duplicating services rather than medical care, Neal could not recover the "reasonable value" of these services as part of her costs. But it is established that when a statute provides for attorneys' fees as part of costs, the prevailing party *may* recover for the reasonable value of the legal services, whether or not the winner has an obligation to pay the lawyer that sum. E.g., *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). If the formula "attorneys' fees as part of costs" supports the lodestar method, then the formula "attorneys' fees as part of damages" does so too.

A handful of fee-shifting statutes are explicit about limiting recoveries to actual outlays. For example, the Equal Access to Justice Act allows recovery of attorneys' fees "incurred" by the prevailing party. 28 U.S.C. § 2412(d)(1)(A). See *United States v. Paisley*, 957 F.2d 1161, 1164 (4th Cir.1992). Other similar statutes include the fee-shifting provision for successful challenges to IRS actions, 26 U.S.C. § 7430(c)(1)(B)(iii) ("paid or incurred"); see *Marré v. United States*, 38 F.3d 823, 828–29 (5th Cir.1995); and the Uniform Relocation Act, 42 U.S.C. § 4654 ("reimburse" and "actually incurred"); see *United States v. 122.00 Acres of Land*, 856 F.2d 56, 58 (8th Cir.1988). Congress could have used this model in the False Claims Act but did not, and the formula it actually chose has greater affinity to § 1988 than to the Equal Access to Justice Act. We therefore hold that the district judge did not err in using the lodestar method to calculate a reasonable-fee award of $1.46 million.

Having assimilated § 3730(h) to § 1988 on fee issues, we finish the job by assimilating it to § 1988 on cost issues. Section 3730(h) says that a wronged employee is entitled to "litigation costs". The district court ordered Honeywell to cover not only the "costs" specified in 28 U.S.C. § 1920, the definitive list of recoverable costs, see *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), but also the fees of expert witnesses, travel expenses, "Judith Neal's expenses," and "miscellaneous expenses." *Crawford Fitting* and *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), hold that the list in § 1920 establishes that other expenses of suit are not "costs," and thus are not compensable *as* costs, unless some other statute provides for reimbursement. "Litigation costs" sounds like a reference to ordinary costs; that's what the list in § 1920 defines. See also, e.g., *United States v. Stefonek*, 179 F.3d 1030 (7th Cir.1999) (holding that the "costs of prosecution" in criminal tax cases are limited to the list in § 1920). The award of costs is reduced by $77,884, and the judgment, as thus modified, is affirmed.