**Judith A. NEAL, Plaintiff,**

v.

**HONEYWELL INC., et al., Defendant.**

**No. 93 C 1143.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 13, 1998.

William J. Holloway, Michael John Leech, William G. Swindal, Thomas Stanley Malciauskas, Robert Hill Smeltzer, Eric W. Apple, Hinshaw & Culbertson, Chicago, IL, for Judith A. Neal.

James A. Burstein, Michael A. Warner, Thomas Hill Peckham, Michael B. Hubbard, Noah A. Finkel, Seyfarth, Shaw Fairweather & Geraldson, Chicago, IL, for Honeywell Inc. and Alliant Techsystems Inc.

Michael D. Monico, Monico, Pavich % Spevack, Chicago, IL, for Janis Frederick.

## *MEMORANDUM OPINION AND ORDER*

PLUNKETT, District Judge.

Before us is a prolix stack of post-trial motions filed by both the plaintiff, Ms. Neal, and the defendant, Honeywell. The three-week trial which preceded them told the disturbing story of a munitions manufacturer (the Joliet Arsenal, a division of Honeywell) during the mid–1980's. Honeywell, unlike the arms maker who created a peace prize or who contributed profits to the poor,[1] manufactured defective shells, falsified its own test results, and repeatedly shipped faulty ammunition to the U.S. Army (a real life reenactment of the play *All My Sons* by Arthur Miller). To make matters worse, the jury found that Honeywell then retaliated against and forced out of the company the one individual with courage enough to bring the appalling practice to the attention of the company's top management. Ms. Neal was awarded $550,000 for emotional distress and $40,000 in lost wages for what the jury concluded was a violation of 31 U.S.C. § 3730(h) of the False Claims Act.[2]

We turn to those post-trial motions, addressing first Honeywell's and then Neal's.

## I. *Honeywell's Post–Trial Motions*

### A. *The jury's award of back pay should be stricken*

Here, Honeywell attacks with both barrels. It claims that the jury's finding of Neal's constructive discharge by Honeywell in early August 1987 is irreconcilable with the jury's finding that Honeywell's denial of Neal's promotion in April that year was not discriminatory. Alternatively, Honeywell posits that Neal's admitted refusal to accept lateral transfer opportunities constituted a failure to mitigate damages. We believe Honeywell misfires in both of its assertions and that the award of back pay was well within the province of the jury.

In awarding back pay, the jury necessarily found that Neal had been discharged in or about early August of 1987. Here, the time line becomes important. Ms. Neal reported the falsification of ammunition records in early March. It was during this time (March and April 1987) that Neal was considering transferring to another Honeywell facility for reasons having little to do with her whistleblowing actions. During March and April she sought and received two offers (one from a Florida plant and one from Honeywell's headquarters in Minnesota). The offers disappointed Neal because she felt that both were simple lateral transfers and she was expecting a promotion with the transfer. She turned down both offers and stayed at the Joliet, Illinois arsenal. She left Honeywell over three months later in early August 1987. Neal testified (and no contrary evidence was ever offered by Honeywell) that during the three months between her decision not to transfer and her constructive discharge, her situation worsened at Honeywell. She was ignored by the in-house investigation by Honeywell, was ordered on a paid vacation for a month, and given nothing at all to do. She testified that she spent weeks sitting in her office watching the cows graze outside her window. The jury decided that when Honeywell offered a transfer to another of its facilities, it had little or nothing to do with its subsequent constructive discharge of Ms. Neal. Neal would have transferred with a promotion or raise but neither was offered. That scenario which the jury found to be non-retaliatory hardly means that Honeywell's subsequent conduct is somehow excused.

Honeywell also argues that the failure to accept the lateral transfer was a failure to mitigate. Hardly. The jury could certainly find that Neal had no way of knowing she would be forced out months later. Thus, she could hardly be expected to anticipate Honeywell's action later on and begin mitigating damages before her departure. We recognize that an employee cannot claim con-

---

1. *See* Shotwell in *Major Barbara* by George Bernard Shaw.

2. The Seventh Circuit, on interim appeal in this case, found that Ms. Neal was protected under

this statute even though no action was commenced by the U.S. government to recover its damages. *Neal v. Honeywell, Inc.,* 33 F.3d 860 (7th Cir.1994).

structive discharge if there were reasonable nondiscriminatory transfer offers. *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497–98 (8th Cir.1995) holds that an employee who fails to accept transfer to another facility at comparable position and salary fails to mitigate. But to repeat—the transfer offers came before, during, and shortly after the retaliation began and long before Ms. Neal lost all of her responsibilities. Neal was assured by top Honeywell executives that she would be protected against repetition of Honeywell's premature disclosure of her identity and Young's threat. She was under no obligation to accept a lateral transfer when she anticipated she would be able to continue working at Joliet without further repercussions. No evidence suggests that the transfer offers were renewed by Honeywell in August when Ms. Neal felt forced to leave. Nor does it matter that Neal's "dream log" indicated she had decided to leave Honeywell by late April. The jury was entitled to accept her testimony that while she may have been thinking that way in April, she often vacillated on the issue. We simply do not believe that Neal's refusal to accept a lateral transfer in April (which she herself initiated) contaminates the jury's verdict finding a constructive discharge months later.

### B. *Plaintiff's interim earnings*

■ Honeywell asks that the award of lost wages be eliminated because in its view, the jury was confused in arriving at that award. The jury was asked on the verdict forms to enter the amount plaintiff would have earned had she not been constructively discharged. The jury answered "$50,000." The jury was asked to enter the amount that she could have earned in the exercise of reasonable diligence and it answered "$10,000." These findings, according to Honeywell, are nonsense. Experts for both sides took it upon themselves to opine on the amount Neal would have earned at Honeywell if she had stayed there until shortly before the trial. Each then calculated her actual earnings as a professor at The University of New Haven. Because they used radically different assumptions, one expert concluded, Ms. Neal experienced no lost wages, while the other opined that hundreds of thousands of dollars had been lost. Thus, Honeywell concludes, the amount of the verdict must have come from thin air.

It is clear, however, what the jury did. It recognized the uncontested evidence that from August 1987 until September 1988, Ms. Neal was essentially unemployed, except for teaching one course during the spring semester at New Haven. Ms. Neal was earning around $40,000 or so when she left Honeywell in August, and the jury simply gave her fourteen months of back pay and subtracted her part-time teaching salary and other earnings during that period—thus, the result of $50,000 lost wages and the $10,000 set off. But what about the experts? The jury accepted the testimony of neither; hardly surprising in light of the often highly suspect assumptions made by each.[3] It is true that the inquiry in the jury form may be read to inquire into the amount of wages lost from August 1987 to the present. But the jury was entitled to accept neither expert and conclude that after Ms. Neal became a full-time professor she was essentially as well off as she would have been if she had stayed at Honeywell. The jury could also have properly concluded that the plaintiff simply failed to prove any additional lost wages and rejected Honeywell's assertion she came out way ahead. We see no compelling reason to interfere with the jury's findings.

### C. *The threats shown by the evidence cannot constitute a basis for constructive discharge or harassment*

■ In this section, Honeywell levels its heavy artillery at this Court, not the jury. It attacks the admission of evidence concerning a threat made against Ms. Neal as inadmissible hearsay. That threat was made by Mr. Young (Joliet's production manager) who reportedly voiced a desire to break the legs of the whistleblower (there were variations on the theme from other witnesses). Ms. Neal was not present when Young uttered his

---

**3.** For example, plaintiff's expert kept assuming promotions with large pay increases when there was little or no basis in the record for such a position. Defendant's expert found Neal's teaching position so lucrative that it dwarfed her earnings at Joliet.

threat, but learned of it from her co-employee, a Mr. Long. "Hearsay" barks Honeywell and from that premise builds a somewhat convoluted argument to support its claim that allowing Ms. Neal to testify about what Long told her was inadmissible hearsay and reversible error.

Honeywell's argument starts on a tangent. It notes that Young never named who the whistleblower was in his threat, and he may not have known her identity. So what? Young threatened the whistleblower, whoever he or she was, and that threat was relayed to Neal. Surely she could be frightened that Young would soon learn her identity. Other evidence in the trial showed her identity was hardly a carefully guarded secret. In any event, the fact is that the Court admitted Neal's recounting of what Long told her about Young's threat not for its truth, but to prove, true or not, the effect it had on Ms. Neal, whose state of mind was critical in determining whether there was retaliation, constructive discharge as well as much of the compensatory damages. The Court instructed the jury that it must not accept the utterance as true, i.e., that Young had threatened to break the legs of the whistleblower, but only consider the fact that Ms. Neal may have believed there was such a threat (so called "effect on hearer"). As it later developed, the jury learned that Young admitted making a threat to get the whistleblower. That evidence was admitted without objection and clearly proved the existence of a threat.[4] The only difference was that Young's recounting of his remark was somewhat gentler than what Long told Neal ("I'll get the whistleblower"). There is evidence that the threat occurred—Young admitted it—and there is evidence that it was conveyed to Neal by her coworker. The jury had to determine what threat was made and it was instructed not to use Neal's testimony about Long's report to prove that. But the jury was also to determine whether Neal was afraid, and it was entitled to rely on Long's story to Neal to determine if fear existed. We conclude the Honeywell shells have fallen short of their target.

■ Honeywell goes on to argue that it reprimanded Young for his statement and thus Young's single threat cannot constitute a basis for a constructive discharge. See Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 535–36 (7th Cir.1993). This assertion is problematic since the evidence showed Young's "reprimand" bore an uncanny resemblance to a promotion. But in any event, the threat was only one of several actions by Honeywell from which the jury could reasonably conclude retaliation was in progress. And whether Young was reprimanded or not, there is precious little evidence that Neal knew about it or found any solace in it.

■ Defendants' final salvo rests on the notion that none of Honeywell's acts individually are sufficient to constitute constructive discharge or harassment. This argument is a dud. First of all, the simple fact that Honeywell has an innocent, non-discriminatory explanation for the conduct means nothing after the jury rejected it. Secondly, Honeywell never does explain the largely uncontroverted testimony of Neal that for the last several weeks before she left, she was given nothing to do.[5] She sat looking out her window at a grazing cow. The jury would have been fully justified in concluding this, together with a paid but unrequested month's vacation, conveyed a clear message to Neal to get out. The jury would certainly be entitled to find Neal faced intolerable conditions which amounted to a constructive discharge. What job is worse than one with nothing to do?

4. It is feasible to argue that Neal's recounting of Long's warning of Young's threat *was* admissible for its truth. Young's threat contains legally operative words and is not hearsay. The threat is also rather clearly a statement of Young's then existing state of mind. Fed.R.Evid. 803(c). Long and Neal worked together and were involved, at least peripherally, in the investigation of wrongdoing. Long's statement to Neal is one employee talking to another about these matters.

Such remarks may very well be an admission of Long speaking about matters within the scope of his employment. Fed.R.Evid. 801(d)(3)(c). There is double hearsay, but each prong seems independently admissible. Fed.R.Evid. 805.

5. Honeywell did produce a witness who testified that there was no change in Ms. Neal's duties. She said very little else and made no effort to counter Neal's testimony of enforced idleness.

## D. *The jury's award of emotional distress was excessive*

The plaintiff presented clear and substantial evidence of her emotional distress, which began at or near the time Honeywell first began to react to the whistleblowing (March or April 1987) and lasted until she began her first year as a college professor.[6] Ms. Neal explained her physical and psychological problems to the jury, and her psychologist, Doctor Tellefsen, supported that testimony. The diagnosis was clinical depression, and Ms. Neal's behavior after her discharge, particularly over the following year, provides a solid basis for an award of compensatory damages. But how much?

The jury gave Ms. Neal $550,000 based on evidence that showed Ms. Neal was depressed and unable to work from August to December 1987. She obtained a part-time teaching job in January for the spring semester at a university and did well enough to be offered a full-time position the following fall. Even under the plaintiff's own argument, the major depression lasted for eight months and eased slowly thereafter. Ms. Neal never sought psychiatric help for her depression and certainly had recovered by the time she took on what she herself described as a highly demanding job as a professor at New Haven.

■ The Seventh Circuit has established three criteria to evaluate whether a compensatory damage award warrants a new trial or remittitur.

(i) whether the award is monstrously excessive;

(ii) whether there is no rational connection between the award and the evidence; and

(iii) whether the award is roughly comparable to awards made in similar cases.

*Merriweather v. Family Dollar Stores of Ind.*, 103 F.3d 576, 580 (7th Cir.1996).[7]

■ Initially, we believe the verdict of $550,000 is monstrously excessive and has no rational basis in the evidence. Viewing the evidence in the most favorable light to Ms. Neal, we find a plaintiff who was, admittedly, having trouble in her marriage and was dealing with a son who had a drug habit. She was understandably upset with her treatment at Honeywell after she reported the falsification of records. She could have been found to be concerned about Honeywell's failure to protect her identity and a threat from her supervisor. After she resigned at Honeywell, she left her husband and tried living with an old boyfriend. That was a failure. After returning to New Haven in the late summer, the clinical depression that Ms. Neal did suffer ended when she began full-time an admittedly demanding teaching career. Ms. Neal never sought help from psychologists or psychiatrists during any of this time. She may have suffered a serious wound, but it healed in due course and there was no evidence it had any lasting effects. An award of more than one-half million dollars for these events with these results is simply off the charts. No one suggested or could have that Ms. Neal went through hell.

We believe that the plaintiff's method of trying this case was largely responsible for this extraordinary award. The vast majority of her evidence pertained not to her harassment or constructive discharge, but to Honeywell's motivation to force Ms. Neal out. Fine—but the sheep's clothing concealed a wolf. Proving motive is permissible, but it soon became the focal point of the case. Plaintiff devoted days of testimony showing the extent of the fraud and even attempting to show a cover-up after Honeywell reported the falsification to the Army. This was, we believe, a successful attempt to upset the jury. Compensatory damages are not meant as retribution.

We turn then to examine awards made in similar cases—an often unrewarding effort because the facts of the cases vary so widely. As noted in Honeywell's post-trial motions, the most exhaustive comparison of emotional distress damages seems to be contained in *Nyman v. FDIC*, 967 F.Supp. 1562 (D.D.C. 1997). That court found the range of acceptable jury awards to be between $10,000 and

---

6. The plaintiff herself admits her damages ceased altogether when she began teaching full-time at the University of New Haven in the fall of 1988. (Pl.'s Mem.Supp.Final J. at 12.)

7. Our circuit has been dubious of the monstrously excessive yardstick and suggests it be merged with the rationality inquiry. *U.S. EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1284 (7th Cir.1995). We will attempt to do so.

$150,000. Further, a review of recent Seventh Circuit emotional harm damages in the employment context was undertaken in *Williams v. Pharmacia, Inc.*, 956 F.Supp. 1457, 1471–75 (N.D.Ind.1996). *See also Schimizzi v. Illinois Farmers Ins.*, 928 F.Supp. 760, 777–80 (N.D.Ind.1996) ("when compared to awards in other employment discrimination cases the jury's $250,000 award for emotional distress ... damages is monstrously excessive."). We conclude that a remittitur should be offered to plaintiff. *See Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1229 (7th Cir.1995) (approving remittiturs when damages are not proportioned to the injury suffered by plaintiff). Plaintiff may accept an award of $200,-000 in compensatory damages or be given a new trial on that issue only. That amount clearly compensates fear of a threat or depression surrounding her ostracized status during her last several months at Honeywell, as well as her one year of depression thereafter.[8] In considering this proposal, plaintiff should recognize that the Court will not extend the same latitude in permitting evidence on the nature and extent of the Honeywell fraud in a retrial on this issue.

## II. *Ms. Neal's Post–Trial Motions*

The majority of Neal's motions deal with questions perhaps envisioned, but never decided by any court. They involve an analysis of a statute often silent about or unclear in its intent. This Court in deciding these questions is not only writing on a clean slate, but can only use chalk in doing so. The Seventh Circuit, which will review these issues *de novo*, will chisel that slate. Thus, our decisions here may be little more than a voice crying in the wilderness. We begin by setting forth section 3730(h) in pertinent part:

> (h) Any employee ... shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back

pay, interest on the back pay and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

### A. *Neal's request for a new trial on punitive damages*

■ Before trial we had tentatively decided to submit the issue of punitive damages to the jury. Before its verdict we concluded we would not. We should now say why.

Section 3730(h) neither provides for nor prohibits punitive damages, and we must try to determine Congressional intent. Our search unearths several clues. First, the legislative history reveals that the original Senate version included the clause "if appropriate under the circumstances, the court shall award punitive damages." S.Rep.No. 99–345, 99th Cong. 2nd Sess. at p. 35, 1986 U.S.Code Cong. & Admin.News at pp. 5266, 5300. The provisions enacted into law, however, were from the House version. H.R.Rep.No. 99–660, at 32 (1986). That version does not authorize punitive damages.

Secondly, section 3730 is extensive and specific in spelling out its remedies. The whistleblower is entitled to bring a *qui tam* action entitling her to recover up to twenty-five percent of the settlement with the government.[9] A whistleblower is entitled to doubled back pay as well as interest on the back pay. A whistleblower receives compensatory damages, moving expenses, attorney's fees and costs. Thus, Congress appears to identify the specific remedies it has in mind in its statutory scheme. Some are already punitive in nature. For example, back pay with interest and moving expenses would appear to render plaintiff whole. Doubling the back pay does more and can only be intended to punish the employer. Awarding punitive damages would punish it twice. Other federal statutes such as the Age Discrimination in Employment Act ("ADEA")

---

8. The Court's $200,000 figure attempts to recognize there were really two separate and distinct aspects to Neal's compensatory damages—one for the last four months at work and another for the twelve months thereafter.

9. Ms. Neal lost that right by making no *qui tam* claim until the filing of her suit five and one-half years after her disclosures. *Neal v. Honeywell, Inc.*, 33 F.3d 860, 864–65 (7th Cir.1994).

have provided for liquidated damages. 29 U.S.C. § 626(b). When liquidated damages are available, punitive damages are not. *E.g., Kelly v. American Standard, Inc.,* 640 F.2d 974, 979 (9th Cir.1981). Indeed, the Supreme Court has held that liquidated damages under the ADEA are "punitive in nature." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 125, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Double back pay seems to bear an eerie resemblance to liquidated damages.

The plaintiff argues that the First Circuit's decision in *Reich v. Cambridgeport Air Systems, Inc.,* 26 F.3d 1187 (1st Cir.1994) reads to the contrary. There, the court found that punitive damages were an appropriate remedy under OSHA. But there the court was interpreting a statute which provided for "all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay." 29 U.S.C. § 660(c)(2). Our statute section 3730(h) contains a detailed list of specific remedies and omits the all encompassing "all appropriate relief" language under which the court approved punitive damages.

It is also significant that insofar as we can discern, all other federal whistleblowing statutes include a specific provision for exemplary damages when such are deemed appropriate by Congress. *See* 42 U.S.C. § 5851(d) (which protects whistleblowers at nuclear facilities); 15 U.S.C. § 2622(d) (toxic substances); 42 U.S.C. § 300j–9(i)(4) (public water systems); 42 U.S.C. § 7622(d) (air pollutants). Indeed, in the statute we are considering, 31 U.S.C. § 3729(a), specific civil penalties, between $5,000 to $10,000 per claim, are provided for the government irrespective of any damage it might have sustained. We believe it is telling that no similar mention of penalties or liquidated damages is found in the provisions of that same statute that deal with the protection of whistleblowers.

Finally, we did not submit the issue of punitive damages to the jury because even if appropriate under the statute, they were not appropriate in this case. Neal suggests that her proof showed "evil motive" and that punitive damages must be available to her to distinguish this case from one where the employer acts "wrongfully, but sincerely"—

whatever that means. (Pl.'s Mem.Supp. Final J. at 16.) That argument is a mystery. Honeywell did not fire Neal. Honeywell took no adverse action in the sense of demotion or reduction of pay. Neal did learn of a threat against a whistleblower and her identity was known to some of her superiors. Nothing else came of that, however. None of her other grievances during the Honeywell investigation were shocking or even unduly troublesome. The jury found retaliation and constructive discharge not because of evil acts, but because Honeywell was often indifferent and careless and, in the last analysis, the company intentionally forced her out. The jury had to have found constructive discharge when the company ignored her for months and gave her nothing to do. This conduct is simply not egregious enough, in our view, to justify submission of punitive damages to the jury. It was intentional and it was wrong, but so is retaliation and constructive discharge. It is not made worse by calling it evil. Neal's suggested list of horribles if employers can get away with these actions without facing punitive damages is so much cannon fodder. The fact is that Honeywell is liable for doubled back pay, interest, compensatory damages, and perhaps a million dollars not only to its own lawyers but to Neal's as well. Hardly a free pass even for the mean-spirited. We conclude now, as we did before, that the issue of punitive damages did not belong before the jury.

### B. *What is the amount of doubled back pay*

The jury concluded that Neal was entitled to $50,000 in back pay less $10,000 earned in mitigation. Under the statute we double that $50,000 and subtract $10,000 for a beginning figure of $90,000. So far so good. But what about interest. Is it on the back pay or the double back pay? § 3730(h) provides for "2 times the amount of the back pay, [and] interest on the back pay." It does not provide for interest on the doubled back pay. Thus, the statutory language seems to answer the question. If not, the legislative history of § 3730(h) does the trick by noting that, "the interest payable is to be calculated before the back pay is doubled." H.R.Rep.

No. 99–660, at 23 (1986); *see also Fortino v. Quasar Co.*, 950 F.2d 389, 397–98 (7th Cir. 1991) (refusing to award prejudgment interest on liquidated portion of damages award because the liquidated portion is punitive). And finally, where do we begin? Do we award interest on the back pay of $50,000 or the net back pay of $40,000? Logic suggests it must be net back pay for otherwise Neal would receive interest on every dime she would have made if she had stayed at Honeywell for the last ten years despite having fared as well at the University of New Haven over the last nine years. We conclude that interest must be calculated on $40,000 since June 1988 to the date of the verdict. That number is then to be added to $90,000.

The final interest questions are simple or compound and at what rate. Taking these in reverse order the Seventh Circuit has suggested prime rate is appropriate where there is no statutory interest rate. *Gorenstein Enters., Inc. v. Quality–Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir.1989). Plaintiff's contention that the state post-judgment interest rate should be used is flawed and not supported by her case law.

As to simple versus compound, in employment cases prejudgment interest is compounded annually. *Merk v. Jewel Food Stores*, 813 F.Supp. 1324, 1330–31 (N.D.Ill. 1992). We believe the interest must be compounded to make plaintiff whole—a clear purpose of the remedial sections of 3730(h). Honeywell argues this is unfair in light of the fact that Neal waited five and one-half years before bringing suit. We have trouble understanding why that should matter. Thus, the interest on the $40,000 of net back pay is to be at the prime rate for each year from 1988 through trial and that interest is to be compounded on a yearly basis.

### C. *Should pre-judgment interest be awarded on the compensatory damages claim*

█ We answer this question no. As clearly argued by Honeywell in its response to plaintiff's post-trial motions, where a plaintiff suffers actual out-of-pocket losses such as lost pay or moving expenses, the plaintiff is deprived of the time value of the money and the defendant is unjustly enriched by having its use over the same time period. Neal's

damages for emotional distress have nothing to do with economic loss nor unjust deprivation of money. Thus, the rationale for prejudgment interest disappears. *Marshall v. Security State Bank of Hamilton*, 970 F.2d 383, 385 (7th Cir.1992). Further, there is no reason to suppose that the jury's award of compensatory damages spoke in terms of dollars back in 1987 and 1988. Indeed, we presume it chose that amount which it felt would compensate Ms. Neal at the time of its verdict. For these reasons, we see no good reason to permit an interest award on damages arising out of emotional distress.

### D. *The proper measure of plaintiff's attorneys' fees*

█ In a statute with ofttimes murky meanings, we confront hopefully the last, but clearly not the easiest, of its enigmas. Section 3730(h) provides in pertinent part:

> Any employee who is discharged ... shall be entitled to all relief necessary to make the employee whole. Such relief shall include ... compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h). At first glance, this appears to be a simple fee shifting provision requiring the defeated defendant to pay the reasonable attorneys' fees of the victorious plaintiff. This remedy is now commonplace in most discrimination actions, employment or otherwise. Neal's attorneys say those reasonable fees total in excess of $1.2 million dollars and ask to be paid under the "gift shop" rule—"if you break it, you pay for it." (Pl.'s Reply Mem. at 13.)

Not so fast replies Honeywell. Note that section 3730(h) says relief is designed to make plaintiff whole. That "whole relief" is special damages ... including her reasonable attorneys' fees. If attorneys' fees are special damages, then their amount must be limited to those paid or incurred by Neal. Neal incurred an obligation to pay one-third of her recovery after a trial under her contingent fee agreement with her attorneys. Thus, her attorneys' fees are limited to some $200,000 or so (one-third of $200,000, the current compensatory damages under remittitur without

interest and some $200,000 on the doubled back pay with interest on the back pay).

This rather ingenious argument has some appeal. It is the method by which attorneys' fees are calculated under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(i)(A), *see S.E.C. v. Comserv Corp.*, 908 F.2d 1407, 1414–15 (8th Cir.1990), and other federal statutes, *see* 42 U.S.C. § 4654 (Uniform Relocation Assistance and Real Property Acquisition Policies Act). In *Eureka Inv. Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932 (D.C.Cir. 1984), the court distinguished attorneys' fees as damages from attorneys' fees awarded pursuant to a fee shifting statute:

> [I]n a private damages action, the court is not asked to set the attorney's fees. Rather, once a finding of liability for attorney's fees has been made, the role of the trier of fact is the same as in any other case involving a claim for expenses as consequential damages—to determine whether the expense has in fact been paid or incurred, whether the expense is related to the wrong upon which liability has been based and whether the expense was reasonable.

The Seventh Circuit also has tied attorneys' fees awarded as damages to the amount plaintiff incurs or pays for legal representation in the proceeding. *Endicott v. Huddleston*, 644 F.2d 1208, 1217 (7th Cir.1980) (entitling plaintiff to recover compensatory damages in the amount of attorneys' fees expended); *American Optometric Ass'n v. Ritholz*, 101 F.2d 883 (7th Cir.) (upholding damages award based on legal fees because trial record showed expenditure of at least the amount claimed), *cert. denied*, 307 U.S. 647, 59 S.Ct. 1047, 83 L.Ed. 1527 (1939).

The only reported decision involving calculation of attorneys' fees under section 3730(h) is *Godwin v. Visiting Nurse Ass'n Home Health Serv.*, 831 F.Supp. 449, 454 (E.D.Pa. 1993), *aff'd*, 39 F.3d 1173 (3d Cir.1994), in which the court there found that plaintiff was entitled to recover as damages "twice her lost wages ... and attorneys' fees and costs *she has incurred* in prosecuting this lawsuit" (emphasis added). Following that lawsuit, the defendant filed for bankruptcy protection and in that proceeding the bankruptcy court approved Godwin's claim against the estate, which included attorneys' fees calculated at forty percent of the other established damages. *In re Visiting Nurse Ass'n,* 176 B.R. 748 (Bkrtcy.E.D.Pa.1995).

Thus, since Ms. Neal has neither paid nor obligated herself to pay her counsel for all hours worked on her behalf, she cannot claim the value of those hours—some $1.2 million dollars—as damages.

Ms. Neal regards this analysis as akin to the thirteenth chime of a clock—an interesting phenomena, but bizarre nonetheless. Neal says that the characterization of her legal fees as *special damages* in section 3730(h) simply cannot mean that Congress wished to take a dramatically different approach to the award of reasonable attorneys' fees in section 3730(h) from all other provisions of the whistleblower statute which clearly allow recovery of reasonable attorneys' fees whether incurred by the plaintiff or not. § 3730(d)(1), (2) and (4). And if so, why does Congress flag such a meaningful difference with the mundane words "special damages." Neal points out that Honeywell's Seventh Circuit authority which tied attorneys' fees awarded as damages to the amount plaintiff incurs or pays for legal representation has been overruled at least implicitly by the Supreme Court in *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (ruling that a contingent fee agreement does not serve as a cap on the amount of attorneys' fees that can be awarded under a fee shifting statute).

As we noted, when we began an analysis of Ms. Neal's motions, too often there is precious little guidance either in the language of the statute or in the paltry number of cases that even touch upon its meaning. We strike out alone. We hold that section 3730(h) as well as all the other attorneys' fees referenced in the text of that statute are intended to be fee shifting provisions. First of all, in the earlier appeal of this case, Judge Easterbrook noted that the word "action" was repeatedly used in the statute and the words presumptively mean the same thing throughout. The term "reasonable attorneys' fees" appears four times in this statute and the first three times it clearly means fees that are shifted to the defendant. There is no good reason to suppose Congress meant something different the fourth time.

Further, the language of the section refers to "compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." This phrase could mean the plaintiff's compensation includes reasonable attorneys' fees. In other words, the "including attorneys' fees" phrase can be thought to modify the word "compensation" just as easily as the words "special damages" without doing violence to the English language. Finally, the commentators Helmer, Lugbill and Neff, Jr. in their work *False Claims Act: Whistleblower Litigation*, makes the following comments about the 1986 amendment to the statute which added reasonable attorneys' fees to those four provisions of the Act.

§ 1501. Introduction.

Under the "American Rule," a party to a lawsuit generally bears its own attorneys fees unless there is express statutory authorization to the contrary.[10] In 1986, one of the significant amendments to the False Claims Act was the addition of fee shifting provisions. Such provisions were designed to encourage private counsel to initiate and participate in False Claims Act litigation, as well as to discourage frivolous lawsuits.[11]

§ 15–1(a). Relator's Right to Attorneys Fees.

Congress intended in 1986 to make it clear that the relator's counsel should be compensated in any successful *qui tam* action. Whether the Attorney General decides to prosecute the *qui tam* action [12] or whether the relator is required to pursue the *qui tam* action alone,[13] Congress determined that the relator is entitled to recover reasonable attorneys fees, costs, and expenses necessarily incurred in bringing the action. Congress also determined that all such attorneys fees, costs and expenses are to be awarded against the defendant.[14]

Thus, the Court sees no reason to adopt the rather anomalous result argued by Honeywell. Reasonable attorneys' fees are part of Ms. Neal's compensation as a successful plaintiff in an employment discrimination case whether clad in the sobriquet "special damages" or not.

### E. *The amount of attorneys' fees*

Ms. Neal's counsel claim over $1.2 million dollars in attorneys' fees and over $150,000 in costs. Under the briefing schedule on post-trial motions, there was no time allotment for discovery. We believe Honeywell should be entitled to examine those fees and costs it questions during a discovery schedule. Thus, we do not now rule on the proper amount. However, that said, there is no reason to further delay the appeal of this lengthy and complex trial. In the event the Seventh Circuit disagrees with our analysis, no discovery will have been needed because the contingent fee agreement will cap the attorneys' fees award. In the other event, Honeywell's discovery and this Court's ruling can be easily accomplished during the pendency of the appeal and the disappointed party can seek to join this last issue to the main appeal.

### CONCLUSION

Neal's and Honeywell's post-trial motions are each granted in part and denied in part as follows:

a. the jury's award of back pay is upheld;

b. the evidence is found sufficient to justify findings of retaliation and constructive discharge;

c. the "hearsay" evidence of a threat was properly admitted;

d. the jury's award of $550,000 for emotional distress was irrational and a remittur to $200,000 is offered to plaintiff in lieu of a new trial on that issue, which plaintiff has accepted;

e. punitive damages were not and should not have been submitted to the jury;

---

**10.** *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

**11.** For a discussion of attorneys' fees, *see* J. Helmer and A. Lugbill, *Attorneys Fees in Employment Cases* §§ 8:22–8:29 *in* Litigating Wrongful Discharge Claims (P. Tobias & S. Sobers eds., 1993).

**12.** 31 U.S.C. § 3730(d)(1).

**13.** *Id.* § 3730(d)(2).

**14.** *Id.* § 3730(d)(1), (2).

f. the amount of the recovery for the back pay is $90,000 plus yearly compounded interest at the prime rate on the actual net back pay of $40,000, which the parties agree totals $144,659 (including $3,277 in other out-of-pocket expenses);

g. no interest is awarded on the recovery of compensatory damages; and

h. attorneys' fees and costs will be determined under the analysis of a fee shifting statute which is what section 3730(h) is. The Court retains jurisdiction to determine the amount of plaintiff's attorneys' fees and costs.

Finally, we conclude that this is a final and appealable order under Fed.R.Civ.P. 58, and disposes of the entire controversy except for attorneys' fees and costs reserved under subparagraph h. *See supra* pp. 899–900. It is fitting that this often tedious analysis of a munitions manufacturer's case should end in the same way as its faulty ammunition did—not with a bang, but a whimper.