198 F.Supp.2d 1080 (2001)
Randolph WILKINS Plaintiff,
v.
ST. LOUIS HOUSING AUTHORITY, Defendant.
No. 4:00CV793 DDN.
United States District Court, E.D. Missouri, Eastern Division.
December 28, 2001.
*1081 *1082 William E. Moench, William E. Moench Law Offices, St. Louis, MO, for Plaintiff.
Larry D. Hale, Andrew T. Pickens, IV, Hale Law Firm, St. Louis, MO, for Defendant.

MEMORANDUM OPINION
NOCE, United States Magistrate Judge.
This matter is before the court, following a jury trial, for non-jury findings of fact and conclusions of law, and for the determination of the parties' post-trial motions. The parties consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).
Plaintiff Randolph Wilkins brought this action against defendant St. Louis Housing Authority (SLHA) to remedy unlawful employment actions. In Count I Wilkins alleged SLHA violated the federal False Claims Act (FCA), 31 U.S.C. § 3729-3733, by taking adverse employment actions against him, including termination, in retaliation for his telling the federal Department of Housing and Urban Development (HUD) about instances of SLHA's failure to comply with applicable law, regulations, and HUD requirements. In Count III[1] Wilkins invoked this court's supplemental jurisdiction to assert a Missouri state law claim that SLHA unjustly terminated him from employment. The court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1367 and 30 U.S.C. § 3730(h).
Following a trial, the jury rendered its findings in favor of Wilkins. See footnote 3, below. Thereafter, the court granted the parties an opportunity to brief Wilkins' entitlement to equitable relief which was submitted to the court for a non-jury determination.

*1083 FACTS

1. The St. Louis Housing Authority (SLHA) is a municipal corporation created by the City of St. Louis to administer and operate its public housing developments. SLHA receives funds from the United States Department of Housing and Urban Development (HUD) under an annual contributions contract.
2. Before hiring on with SLHA, Plaintiff Randolph Wilkins had a career with the United States Air Force. He joined the Air Force in 1967 and was assigned duties in law enforcement and security. When assigned to New Mexico, he acquired an Associate's Degree in Criminal Justice.[2] On April 1, 1992, he retired from the Air Force with a pension of approximately $20,000 per year. Wilkins' wife, a registered nurse, is pursuing a Physicians Assistant Certification. After his retirement, Wilkins learned of a security quality control position at SLHA for which he felt qualified by experience and education.
3. On January 8, 1996, Wilkins was hired by SLHA as a Quality Control Evaluator for Public Safety, at a salary of $33,000.00. This was a new position in the SLHA Housing Management Department.
4. In October 1997, Wilkins informed HUD personnel that SLHA had misreported its compliance with HUD security requirements, including a failure to make background checks on applicants for residential housing; to monitor criminal, drug, and alcohol related activity on public housing property; and to evict offending tenants as part of HUD's "one strike and you're out" program. In November 1997, Wilkins' position was transferred to the SLHA Public Safety Department where he was to track crime problems in the residential units.
5. In November 1997, Quadel, an outside agency hired by HUD to evaluate SLHA, made its report. In May 1998, as a result of this report, HUD designated SLHA a "Troubled Agency" for fiscal year 1997. Thereafter, a HUD Troubled Agency Recovery Center (TARC) team came to St. Louis to work with SLHA to improve the quality of its operations. SLHA entered into a Memorandum of Agreement with HUD that outlined strategies and goals directed toward improving SLHA's performance.
6. Thereafter, Wilkins complained to the TARC team about SLHA's screening of tenant applications, about the compliance report submitted to HUD by SLHA, and about SLHA's failure to implement the "one strike and you're out" requirement.
7. On May 27, 1998, Wilkins was promoted by Tom Costello, SLHA's Interim Executive Director, to the position of Manager of Security Operations. Wilkins received a grade level increase and a salary increase of $5,000. As the Manager of Security Operations, Wilkins' duties included establishing security manpower standards, drafting plans and procedures for emergency plans, acquiring and disposing of equipment, tracking and reporting crimes, drafting plans and procedures for screening residents, tracking the drug elimination program and eviction process, and supervising dispatchers, public safety officers and staff members.
8. Also, in 1998, due in part to the Quadel Report, Costello developed a plan to decentralize and privatize many of SLHA's operations in an effort to increase its level of professionalism. Security was one of the functions to be decentralized and performed by private contractors.
9. During 1998, Wilkins and the SLHA administration disagreed over the proper implementation of security programs and about Wilkins' discussing SLHA security *1084 shortcomings directly with HUD personnel. On October 12, Wilkins met with James Heard, who had become the Housing Management Supervisory Director and Wilkins' boss, and members of the HUD TARC team. In that meeting, Wilkins suggested a program whereby SLHA personnel would officially report fraud and crime in the housing projects. Heard emphatically stated that he did not want SLHA personnel to make such reports. On October 16, Heard told Wilkins that he should not have discussed these matters directly with HUD personnel. On October 21, 1998, Wilkins was temporarily reassigned to SLHA's Cochran Housing Complex.
10. On October 23, 1998, Wilkins was suspended for 80 hours without pay for failing to file a report with his supervisor, James Heard, regarding an altercation with injuries at one of SLHA's housing complexes. Wilkins grieved the suspension to Costello. The suspension was reversed with Wilkins receiving a written reprimand.
11. In January 1999, Wilkins' position title was changed to Security Monitor/Coordinator. His duties included reporting and monitoring various components of the report to HUD. By February 1999, Wilkins became aware that Costello wanted to privatize much of its operations, including the security operations.
12. In June 1999, Cheryl Lovell replaced Costello as the SLHA Executive Director. Costello became SLHA's Director of Management. In July 1999, Lovell met with all of the SLHA personnel, including Wilkins, and discussed the plans to greatly reduce the workforce at SLHA.
13. In September 1999, SLHA posted a job opening notice for the position of Assistant Asset Manager. Wilkins heard about the opening but did not apply for it.
14. In October 1999, the security operations at SLHA were privatized. All of the SLHA security officers were hired by private contractors. Wilkins lost administrative oversight over the officers.
15. On October 1, Wilkins sent a telefax to the HUD TARC team about the security problems at SLHA. Also in October, SLHA began collecting data for its report to HUD for its fiscal year, which ended September 30, 1999.
16. On October 13, 1999, Wilkins complained to Costello that the contractors were not turning in their reports. In reviewing the report and the supporting tally sheet regarding security matters, Wilkins believed the report made incorrect statements about SLHA's compliance with regulations. Thereafter, he spoke personally with HUD personnel and criticized the report.
17. On November 17, 1999, Wilkins sent a letter to HUD. The letter stated that the recent SLHA report to HUD contained knowingly false and fraudulent information. On December 1 and 7, 1999, Wilkins sent letters to Costello complaining about the security contractors not reporting as they should. On December 8, 1999, Costello replied that he did not understand the basis for Wilkins' memos.
18. On January 3, 2000, at age 51, Wilkins received a letter terminating him from employment with SLHA, effective December 31, 1999. He was terminated by SLHA because of his statements to SLHA and to HUD officials about the failure of SLHA to comply with HUD regulations. SLHA would not have terminated Wilkins had he not made these statements.[3] Wilkins was terminated along *1085 with approximately 134 other employees. At his termination, Wilkins was earning a salary of $39,000.[4]
19. After his termination, Wilkins began looking for employment. However, he did not apply with any of the contractors that had obtained the security contracts with SLHA, because he considered their offered pay too low.
20. In October 2000, Wilkins was hired by the Department of Defense in a security position at $40,000 per year. He was assigned to and traveled to Europe and the Middle East. During this time he was separated from his wife who remained in St. Louis pursuing her Physicians Assistant Certificate. On June 28, 2001, Wilkins was terminated from this position. During this nine-month employment by the Department of Defense, he earned approximately $30,000.00. Since then he has applied for work only in the area of security and law enforcement, and only with federal executive branch agencies. He has not yet obtained new employment.[5]
21. At the time of his termination from SLHA, Wilkins had no intention to quit his employment with SLHA in the foreseeable future. Nevertheless, because his education and training were in the area of security and law enforcement, because SLHA had contracted the security function at its facilities to private companies, because Wilkins did not look for work with private companies in the security area, and because his employment with SLHA was as an at-will employee, Wilkins would have remained employed at SLHA for not longer than two years after December 31, 1999, had he not been terminated. Also, having been terminated, Wilkins was and is reasonably able to find replacement employment that is reasonably comparable to his *1086 employment with SLHA, within two years after his termination by SLHA. An award of $10,000[6] in front pay will fully compensate plaintiff for his lost income from the date of the jury's findings to the date of this opinion.

DISCUSSION

DEFENDANT'S MOTION FOR JUDGMENT
Defendant SLHA has moved for judgment as a matter of law on Count I, the claim brought under the whistleblower protection provision of the FCA. 31 U.S.C. § 3730(h). Generally, the FCA, as amended in 1986, provides for civil liability[7] to the United States by "[a]ny person" who engages in one or more of the activities enumerated by the statute relating to making false claims to the government. Id. at § 3729(a). Civil actions may be brought by the Attorney General or by private persons (qui tam claims). Id. at §§ 3130(a), (b).
The FCA protects the employment rights of potential qui tam plaintiffs (whistleblowers) as follows:
Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.
Id. at § 3730(h)(1986).
In order to prove a claim of retaliation under 31 U.S.C. § 3730(h), a plaintiff must establish that (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff-employee's engaging in the protected activity. Norbeck v. Basin Elec. Power Coop., 215 F.3d 848, 851 (8th Cir.2000); U.S. ex rel. Rosales v. San Francisco Housing Authority, 173 F.Supp.2d 987, 1025-26 (N.D.Cal.2001). The employee presents a prima facie case of liability by proving that the retaliation was motivated at least in part by the protected activity. Norbeck, 215 F.3d at 850; Rosales, at 1025-26. In response to such a prima facie case, the burden of proof shifts to the employer to prove the affirmative defense that the same adverse employment decision would have been made even if the employee had not engaged in the protected activity. Id. If the employer sustains this burden, it is entitled to judgment on plaintiff's claim. *1087 Norbeck, 215 F.3d at 852. See also, S. Rep. 99-345, at ___ (1986), reprinted in 1986 U.S.C.C.A.N. 5300.[8]
Defendant argues that it is not liable under the FCA, because as a local government agency it is not a "person" within the meaning of the FCA, citing Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). The relevance of Stevens to this case is narrow. In that case, the Supreme Court determined in part that the qui tam liability provisions of the FCA may not be asserted against a State or a state agency. 529 U.S. at 787-88, 120 S.Ct. 1858.
In response, plaintiff argues that the issue of the nature of the defendant was never raised until after the jury rendered its verdict and, therefore, this issue has been waived. Whether or not this issue has been waived, Fed.R.Civ.P. 50(a); Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 635-36 (8th Cir.1998), the court concludes that SLHA as a matter of law is an employer subject to liability under § 3730(h).
The court is persuaded by the reasoning of United States ex rel. Satalich v. City of Los Angeles, 160 F.Supp.2d 1092 (C.D.Cal. 2001). In that case plaintiff brought an FCA action against the City of Los Angeles and independent contractors. The action included both a qui tam claim under § 3729 and a whistleblower retaliation claim under § 3730(h). The court first determined, from the principles of Stevens, that the City was not subject to liability under § 3729(a),[9] but was an "employer" subject to suit under § 3730(h). 160 F.Supp.2d at 1107-08, 1109 (the term "person" is not used in § 3730(h) as it is in § 3729(a)).
One of the cardinal holdings in Stevens is that an award of treble damages under the FCA would be punitive and inconsistent with the presumption against the imposition of punitive damages on government entities. Stevens, 529 U.S. at 784-85, 120 S.Ct. 1858. The court in Satalich further noted that the remedies available to successful plaintiffs under § 3730(h) do not include the punitive treble damages relief available under § 3729. 160 F.Supp.2d at 1109.[10] The legislative history of § 3730(h) supports this view:
As is the rule under other Federal whistleblower statutes as well as discrimination laws, the definitions of "employee" and "employer" should be all-inclusive. .... Additionally, "employers" should include public as well as private sector entities.
S. Rep. 99-345, at ___ (1986), reprinted in 1986 U.S.C.C.A.N. 5299-5300.
In Wilkins' case, the double back pay damages are not punitive, but are intended *1088 by Congress to be compensatory, and may be recovered from a local government political entity. See Satalich, 160 F.Supp.2d at 1109; cf., Hammond v. Northland Counseling Ctr., Inc., 218 F.3d 886, 891-92 (8th Cir.2000) (the statutory provision of "2 times the amount of back pay" was intended as "complete compensation"); contra Garibaldi v. Orleans Parish School Bd., 244 F.3d 486, 493 (5th Cir.2001), pet. filed, ___ U.S. ___, 122 S.Ct. 808, 151 L.Ed.2d 693, 70 USLW 3246 (2001).
Further, in Satalich the court determined, and this court agrees, that FCA retaliation claims do not depend upon the success of an ultimate FCA qui tam claim. 160 F.Supp.2d at 1108. See also, Haley v. Retsinas, 138 F.3d 1245, 1250-51 (8th Cir. 1998); Neal v. Honeywell, Inc., 33 F.3d 860, 863-64 (7th Cir.1994). Thus, the suable party under § 3730(h) need not ultimately be suable under § 3729.
Defendant next argues that plaintiff is not entitled to any back pay, because he did not mitigate his damages. Defendant argues that plaintiff admitted he did not seek employment with the private security companies that took over the security function at defendant's facilities. However, defendant did not allege plaintiff's failure to mitigate damages as an affirmative defense and no such instruction was presented to the jury.[11] The court will, however, consider mitigation regarding the ultimate amount of doubled back pay and the award of front pay, below.
The motion of defendant for judgment will be denied.

PLAINTIFF'S MOTION FOR RELIEF
Plaintiff has moved for a doubling of the back pay award, pre-judgment interest on the back pay, and equitable relief. As set forth above, see footnote 3, the jury found that defendant unlawfully terminated plaintiff from employment.

Doubling of the back pay
For the back pay calculations, plaintiff adverts to the procedures employed by the court in Neal v. Honeywell, 995 F.Supp. 889 (N.D.Ill.1998), aff'd, 191 F.3d 827 (7th Cir.1999). In Neal, the district court first doubled the $50,000 in back pay awarded by the jury and then subtracted from that $100,000 the $10,000 plaintiff had earned since his termination, for a final award of $90,000 in back pay. Id. at 896.
This court declines to employ the Neal methodology, because to do so would award double a component of damages that plaintiff did not sustain, the $30,000 he earned from his Department of Defense employment. In reaching this conclusion, *1089 the court is drawn between rulings of the Supreme Court and of the Eighth Circuit.
In United States v. Bornstein, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), the Supreme Court determined that the Neal-type method was appropriate for calculating the government's double damages on a FCA claim under what is currently § 3729. Bornstein involved (1) recovery by the United States (2) against a subcontractor (3) for damages caused by the subcontractor's causing the prime contractor to present false claims to the government (4) where the government had already recovered damages from the prime contractor for the subcontractor's fraud. 423 U.S. at 305-307, 96 S.Ct. 523. The court determined that
Congress intended the double-damages provision to play an important role in compensating the United States in cases where it has been defrauded.... For several different reasons, this makewhole purpose of the Act is best served by doubling the Government's damages before any compensatory payments are deducted.
First, this method of computation comports with the congressional judgment that double damages are necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims. Second, the rule that damages should be doubled prior to any deductions fixes the liability of the defrauder without reference to the adventitious actions of other persons. . . . Third, the [other methodology by which the deductions are made before the damages are doubled] would enable the subcontractor to avoid the Act's double-damages provision by tendering the amount of the undoubled damages at any time prior to judgment. This possibility would make the double-damages provision meaningless. Doubling the Government's actual damages before any deduction is made for payments previously received from any source in mitigation of those damages forecloses such a result.
* * * * * *
... This method of computation, which maximizes the deterrent impact of the double-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision, best comports in our view with the language and purpose of the Act.
Id. at 314-17, 96 S.Ct. 523 (citations and footnotes omitted).
The Eighth Circuit Court of Appeals considered the issue of double back pay in Hammond v. Northland Counseling Center, Inc., 218 F.3d 886 (8th Cir.2000). In Hammond, one issue dealt with the availability of double back pay to a FCA whistleblower claimant under § 3730(h). After her termination from employment by defendant, Hammond found work with another employer at a rate equal to or greater than that earned with defendant, and the new employer paid Hammond retroactively to the day after she lost her job with defendant. 218 F.3d at 890. The district court granted summary judgment to the defendant employer, because it determined that damages were an essential element of plaintiff's cause of action under § 3730(h).
On appeal, Hammond argued that "the FCA requires doubling of back pay prior to any consideration of mitigation." Id. at 891. However, also on appeal she conceded that damages were an essential element of her FCA cause of action. Id. at 891 n. 6. The court rejected Hammond's argument:
At the outset, we note that neither the FCA nor its legislative history specifically addresses the question of how to calculate "2 times the amount of back pay." Nevertheless, the overarching purpose of the statute is clear: to provide an *1090 aggrieved plaintiff with complete compensation for any injuries incurred as a result of the employer's retaliatory conduct, namely "all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). It is undisputed that, in the instant case, Hammond suffered no pecuniary injury warranting a back pay award as a result of her termination from Northland.... In light of these facts and the statute's explicit aim of compensatory relief, we reject Hammond's proposed method of calculation, which would award damages for an injury that in fact never occurred and thus would give Hammond a windfall, rather than compensation.
Id. at 891-92. The Court of Appeals distinguished Bornstein, because therein "the government incurred additional `costs, delays, and inconveniences occasioned by fraudulent claims,' thus warranting additional damages." Id. at 892 n. 7.
This court determines that the factual context of Wilkins' case is sufficiently different from that of Bornstein and sufficiently akin to that of Hammond that the Neal methodology of doubling the back pay before deducting the mitigating income should not be applied. Bornstein involved a false claim action under the predecessor of § 3729 for compensation to the government for fraudulent activities of a business contractor. Hammond involved a whistleblower's claim under § 3730(h) where the plaintiff's mitigating income offset her lost pay. Although Wilkins mitigating income did not equal his lost back pay, he will nevertheless be fully compensated by the deduction of his mitigating income from his back pay before the doubling. This will avoid a windfall to him of a doubling of an amount he did not lose and comports with the Congressional principle of full compensation under the FCA.
Therefore, the court will award total back pay in the amount of $98,340 ($79,170$30,000) × 2).

Prejudgment interest
Plaintiff seeks prejudgment interest on the back pay, as provided by 31 U.S.C. § 3730(h). Neal determined that, to avoid awarding plaintiff a windfall, the interest should be calculated on the undoubled back pay less the other income. 995 F.Supp. at 897. In Wilkins case, the principal back pay is $49,170 ($79,170-$30,000) upon which the appropriate interest rate would be applied.
Plaintiff invokes the holding in Neal to argue for the use of the prime rate of interest compounded on an annual basis. Id. Defendant would have the court award plaintiff four percent simple interest.
The appropriate general standard for the rate of prejudgment interest on Wilkins' back pay is the rate provided by 28 U.S.C. § 1961(a) ("a rate equal to the weekly average 1-year constant maturity Treasure yield, as published by the Board of Governors of the Federal Reserve System") (Dec. 21, 2000). This rate shall be compounded annually. Id. at § 1961(b). By its enactment Congress determined that this rate appropriately compensates a prevailing party for the loss of use of monetary damages after judgment is issued. No economic or compensatory principles have been asserted which would persuade the court to adopt a different rate standard for loss of use during the prejudgment period.
Rather than apply the weekly variable rates for each respective prejudgment week, the court will apply the average of these periodic rates, from the effective date of Wilkins' termination to the current date, compounded annually. See Luciano v. Olsten Corp., 912 F.Supp. 663, 677 *1091 (E.D.N.Y.1996), aff'd, 110 F.3d 210 (2nd Cir.1997).
The court takes judicial notice under Federal Rule of Evidence 2 that the average of these interest rates for the period from December 31, 1999, up to but not including the current date, determined under 28 U.S.C. § 1961, is 4.84%.[12]

Equitable relief
Plaintiff also seeks an award of front pay as equitable relief. Plaintiff argues that reinstatement is not appropriate in this case because of the hostility evidenced by defendant against plaintiff. Defendant argues for reinstatement.
The first remedial principle of the FCA is that the employee is "entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). The FCA goes on to specifically include reinstatement as an available remedy. Id. While the FCA does not specifically include front pay as a remedy available to the court to effect full compensation, Hammond, 218 F.3d at 892, the court concludes that Congress intended that front pay be awarded in the appropriate case to effect the express Congressional intention that a claimant under § 3730(h) be made whole.
Whether to order reinstatement or front pay is committed to the discretion of this court. See Morgan v. Arkansas Gazette, 897 F.2d 945, 953-54 (8th Cir.1990); Brooks v. Woodline Motor Freight, Inc., 852 F.2d 1061, 1065 (8th Cir.1988); cf., Hammond, 218 F.3d at 892. Substantial animosity between the parties in an employment relationship that requires a high degree of trust and confidence may make reinstatement an improper remedy. Morgan, 897 F.2d at 953-54; see also, Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 121 S.Ct. 1946, 1948, 150 L.Ed.2d 62 (2001); Mathieu v. Gopher News Co., 273 F.3d 769, 776-77 (8th Cir.2001); Hammond, 218 F.3d at 892.
The court concludes that reinstatement would not be an appropriate remedy in this case. Plaintiff and the SLHA administrators developed a mutual animosity that would not be a reasonable basis for a future employment relationship. SLHA privatized its security positions and no reasonably similar position has been identified for plaintiff. Therefore, the court will award plaintiff front pay.
Plaintiff argues that an award of front pay in the total amount of $198,667 is appropriate. This is calculated upon his testimony that he would have worked at SLHA until retirement at age 65, that he would require ten months to find a full time job, that this full-time job would be an entry-level job at $30,000 per year, and that his annual wage and benefits loss until retirement would be $14,000 per year.
The court will award plaintiff front pay in the amount of $10,000 to compensate plaintiff for lost wages from the date of the jury's finding of back pay to December 31, 2001, the date the court has found plaintiff reasonably should be able to find replacement employment. See Finding of Fact No. 21.
Plaintiff has a continuing duty to mitigate his lost income damages. United Paperworkers Int'l Union Local 274 v. Champion Int'l Corp., 81 F.3d 798, 805 (8th Cir.1996) ("An award of front pay until retirement ignores that plaintiff's duty to mitigate damages and the district court's corresponding obligation to estimate the financial impact of future mitigation"). *1092 The court concludes that plaintiff has not mitigated his lost income damages as the law requires.
At his termination by SLHA, plaintiff was 51 years of age and, given his background and experience in security and law enforcement, was employable by both governmental and private employers. Although SLHA unlawfully terminated plaintiff because of his protected activity, his position was an at-will position subject to elimination, and he was subject to lawful termination, at any time. The likelihood his employment with SLHA would have been of limited duration is substantial, given the privatization of the security function at SLHA and the fact that plaintiff was and is not interested in employment outside his field of security and law enforcement. No evidence indicated an inability to perform other duties. Before and after his termination, he did not apply for employment with the private companies who were taking over the security functions at SLHA, although he knew that this function was to be privatized. After his termination, he did not apply for employment in the private sector at all, he did not apply for employment with any government entity other than the federal government, and he did not apply for employment in any area other than security and law enforcement.[13]
Plaintiff's argument that he would have been employed only in an entry-level position is speculative. His argument that he should only be required to look for employment in the St. Louis area, because of his wife's continuing education in this area, is without merit; her education did not prevent him from taking employment with the Department of Defense and relocating to Europe for a time until he was terminated.
Consistent with this Memorandum Opinion, Judgment is issued herewith.

ORDER
Consistent with the Memorandum Opinion of the court filed herewith,
IT IS HEREBY ORDERED that the motion of defendant for judgment as a matter of law (Doc. No. 59) is denied.
IT IS FURTHER ORDERED that the motion of plaintiff for equitable relief (Doc. No. 60) is sustained.

JUDGMENT
This action came on for trial before the Court and a jury, the parties having consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c), the Court having rendered its rulings, and the issues having been duly tried and the jury having rendered its verdicts,
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff Randolph Wilkins have and recover of the defendant St. Louis Housing Authority the sum of $98,340.00 as back pay, plus pre-judgment interest on $49,170 of the said back pay at the rate of 4.84% per annum, compounded annually from December 31, 1999, to the date of this judgment, plus the sum of $10,000 as front pay, plus postjudgment interest at the rate provided by 28 U.S.C. § 1961, plus costs.
NOTES
[1] Count II was voluntarily dismissed by plaintiff without prejudice (Doc. No. 24).
[2] Wilkins has not yet acquired sufficient college credits for a four-year degree.
[3] On October 19, 2001, at the conclusion of the trial, the jury answered Special Verdict questions that indicated the following findings of fact:

1(a). Plaintiff Randolph Wilkins stated to one or more employees or officials of defendant Saint Louis Housing Authority that he believed defendant was not in compliance with federal regulations regarding Indicator 8 (Security).
1(b). Defendant Saint Louis Housing Authority had knowledge that plaintiff made the statement or statements described in Finding 1(a).
1(c). Defendant Saint Louis Housing Authority terminated plaintiff's employment, at least in part, because plaintiff made the statement or statements described in Finding 1(a).
2(a). Plaintiff Randolph Wilkins stated to one or more employees or officials of the federal Department of Housing and Urban Development Troubled Agency Recovery Center team that he believed defendant was not in compliance with federal regulations regarding Indicator 8 (Security).
2(b). Defendant Saint Louis Housing Authority had knowledge that plaintiff made the statement or statements to one or more employees or officials of the federal Department of Housing and Urban Development Troubled Agency Recovery Center team described in Finding 2(a).
2(c). Defendant Saint Louis Housing Authority terminated plaintiff's employment, at least in part, because plaintiff made the statement or statements described in Finding 2(a).
3. Up to the day of the verdict, as a direct result of the facts found with respect to Findings 1 and 2, plaintiff suffered lost wages in the amount of $79,170; but he suffered no damages for mental anguish and suffering.
4. Defendant would not have terminated plaintiff from employment if plaintiff had not made the statement or statements found by the jury with respect to Findings 1(a) and 2(a).
[4] Wilkins' compensation with SLHA included investing 13% of his gross salary amount in a retirement program.
[5] In his post-trial affidavit on the issue of equitable relief, Wilkins states that he has been unable to locate work in his field in the St. Louis area. He further states that he is unable to relocate to another area, because his wife will not complete her Physicians Assistant program in St. Louis until August 2002. Attached to his affidavit is a listing of 18 security positions with the United States government with salary ranges greater than he was earning with SLHA.
[6] This amount is slightly more per month ($4,292) than the jury awarded plaintiff ($3,653).
[7] Committing certain acts proscribed by the FCA renders one liable to the United States for a civil penalty of $5,000 to $10,000 plus three times the amount of damages sustained by the government. 31 U.S.C. § 3729(a) (1986). If the court finds certain described mitigating circumstances, the court may assess not more than two times the damages sustained by the government. Id.
[8] Under the facts of this case, the cause of action on plaintiff's Count III claim for relief under the Missouri common law tort of unjust termination is substantially similar to the Count I FCA retaliation claim. See, Brenneke v. Dept. of Missouri, VFW, 984 S.W.2d 134, 138-41 (Mo.Ct.App.1998). The Count I and Count III claims were both presented to the jury in the same special verdict questions. The relief awarded plaintiff by the jury and the court is founded upon both claims.
[9] One court has determined that a local public housing authority is a "person" suable under the qui tam claim section of the FCA. U.S. ex rel. Rosales v. San Francisco Hous. Auth., 173 F.Supp.2d 987, 1009-16 (N.D.Cal. 2001).
[10] The treble damages provided for in § 3729 have been described as punitive, while the double back pay damages have been determined to be compensatory. See Stevens, 529 U.S. at 784-85, 120 S.Ct. 1858. Cf., United States ex rel. Garibaldi v. Orleans Parish School Board, 244 F.3d 486, 495 (5th Cir. 2001) (without distinguishing between the triple and double damages provided by the FCA, holding that recovery under both the qui tam claim and the retaliation claim was punitive).
[11] The issue of mitigation was expressly withheld from the jury. On the issue of damages, the jury was instructed as follows:

If your findings are in favor of plaintiff, then you must award plaintiff such sum as you find by the preponderance of the evidence will fairly and justly compensate plaintiff for any damages you find plaintiff sustained as a direct result of the defendant's conduct. Plaintiff's claim for damages includes two distinct types of damages and you must consider them separately:
First, you must determine the amount of wages plaintiff would have earned through the date of your verdict in his employment with defendant, if defendant had not terminated plaintiff, without deducting the amount of earnings from other employment received by plaintiff during that time.
Second, you must determine the amount of damages sustained by plaintiff, if any, for mental anguish and suffering.
You must enter separate amounts for each type of damages in the verdict form and must not include the same items in more than one category.
Any award of damages must be reasonable.
See Jury Instruction No. 8 (emphasis added).
[12] The most current rate can be found on the Internet at http://www.federalreserve.gov/releases/h15/current. Prior rates can be found at http:// www.federalreserve.gov/releases/h15/data/wf/tcm17.txt.
[13] Plaintiff found employment with the federal government at a salary slightly above his SLHA salary at termination. Further, attached to plaintiff's post-trial memorandum is an exhibit which lists 17 available federal government criminal investigator positions, with upper salary limits that exceed the amount paid him by the Department of Defense in 2000.